## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ANTHONY SHORE, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | No. 4:13-cv-01898 |
| | § | |
| WILLIAM STEPHENS, Director, | § | **DEATH PENALTY CASE** |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

---

## PETITION FOR WRIT OF HABEAS CORPUS

---

## THIS IS A DEATH PENALTY CASE

Marcy E. Kurtz
Federal I.D. No. 5381
State Bar No. 11768600
marcy.kurtz@bgllp.com
K. Knox "Lighthorse" Nunnally
Federal ID No. 1419997
State Bar No. 24063995
J. Mark Little
Federal ID No. 1487508
State Bar No. 24078869
Ryan C. Myers
State Bar No. 24088110
J. Eric Holland
State Bar No. 24086285
Bracewell & Giuliani LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
Telephone: 713.223.2300
Facsimile: 713.221.1212

*Attorneys for Petitioner Anthony Shore*

## <u>TABLE OF CONTENTS</u>

JURISDICTION .................................................................................................... 1

PROCEDRUAL HISTORY...................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

     A.    The jury finds Mr. Shore guilty of capital murder despite a number of
           evidentiary issues ............................................................................... 3

     B.    During the punishment phase, Mr. Shore's counsel allows the State to
           present its case largely unchallenged and even asks the jury to sentence
           Mr. Shore to death................................................................................ 4

     C.    Mr. Shore's problems with legal representation continue when his state
           habeas counsel fails him as well .......................................................... 7

ARGUMENT .......................................................................................................... 8

I.    Mr. Shore's Death Sentence Violates The Eighth And Fourteenth Amendments
     Because His Mental Illness And Brain Defects Reduce His Culpability For His
     Actions .......................................................................................................... 8

     A.    The Eighth and Fourteenth Amendments prohibit the execution of the
           severely mentally ill and those with certain types of brain defects ...................... 8

           1.    Infliction of capital punishment upon individuals who were
                  severely mentally ill or had certain brain defects at the time of the
                  offense makes no measurable contribution to the acceptable goals
                  of punishment......................................................................... 9

           2.    Like mental retardation, aspects of severe mental illness and
                  certain brain defects undermine the strength of the procedural
                  protections that our capital jurisprudence steadfastly guards ................. 13

     B.    There is reason to believe that Mr. Shore was severely mentally ill and had
           brain defects at the time of his offense .............................................. 16

II.    Mr. Shore Was Deprived Of His Right Under The Sixth And Fourteenth
     Amendments To Effective Assistance Of Counsel In the Punishment Phase
     Through Trial Counsel's Failure To Conduct A Reasonable Mitigation
     Investigation And Contest The State's Punishment Case ................................ 16

     A.    The Constitution guarantees a defendant the right to effective assistance of
           counsel in both the guilt-innocence and punishment phases of a capital
           trial ................................................................................................. 16

B.     An ineffective assistance of counsel claim has two prongs: performance and prejudice .................................................................................................. 18

C.     Mr. Shore's counsel was constitutionally ineffective during the punishment phase of his trial ............................................................................ 24

     1.     Mr. Shore's trial counsel failed to conduct a reasonable and thorough mitigation investigation ............................................ 26

     2.     Mr. Shore's trial counsel failed to adequately contest the State's punishment case by engaging in effective cross-examination and presenting mitigation evidence ............................................... 29

     3.     Mr. Shore's instructions to trial counsel regarding how to conduct the punishment phase of his trial does not excuse counsel's deficient performance .......................................... 30

D.     Mr. Shore need not show prejudice—or alternatively, Mr. Shore suffered prejudice—as a result of his trial counsel's deficient performance ................... 32

     1.     Mr. Shore suffered *per se* prejudice by the constructive deprivation of counsel ................................................................... 32

     2.     Alternatively, Mr. Shore suffered actual prejudice as the result of trial counsel's deficient representation .................................... 33

E.     Section 2254(d) poses no bar to granting relief on Mr. Shore's ineffective assistance of counsel claim ................................................................................. 36

III.     The Trial Court's Failure To Obtain A Valid Waiver Deprived Mr. Shore Of His Constitutional Right To Contest The Punishment Phase Of His Trial ........................... 37

A.     The trial court's failure to ensure that Mr. Shore made a valid waiver deprived him of his constitutional right to contest the punishment phase of his trial .................................................................................................................. 37

B.     Section 2254(d) poses no bar to granting relief on Mr. Shore's waiver claim ..................................................................................................................... 37

IV.     Mr. Shore's Conviction And Death Sentence Are Also Unconstitutional Because His Counsel Was Ineffective During The Guilt-Innocence Phase Of His Trial, His Statement Was Involuntary And Violated *Miranda*, And The State Failed To Turn Over All Exculpatory And Mitigating Evidence ............................................................ 39

V.     All Of The Foregoing Arguments Are Preserved Or Are Otherwise Available ............. 40

A.     Mr. Shore raised his ineffective assistance of counsel and waiver of the right to contest the punishment phase of his trial claims in his state habeas petition ........................................................................................... 40

B.     To the extent the Court considers any of Mr. Shore's claims to be waived, any such failure to raise them earlier is excused.................................................. 40

C.     The miscarriage of justice exception excuses any alleged procedural default of Mr. Shore's claim that his death sentence violates the Eighth and Fourteenth Amendments because he is severely mentally ill or suffers from certain brain defects .................................................................................. 43

CONCLUSION AND PRAYER ............................................................................... 44

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ANTHONY SHORE, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | No. 4:13-cv-01898 |
| | § | |
| WILLIAM STEPHENS, Director, | § | **DEATH PENALTY CASE** |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

## PETITION FOR WRIT OF HABEAS CORPUS
_____

Petitioner Anthony Shore respectfully asks this Court to issue a writ of habeas corpus and grant him relief from his unconstitutional sentence of death.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2241(d) because Mr. Shore was convicted and sentenced to death in the 339th District Court in Harris County, Texas.

## PROCEDURAL HISTORY

Petitioner, Anthony Allen Shore, was charged by indictment with capital murder in cause number 966087. The indictment alleged that Mr. Shore on or about April 16, 1992 did "while in the course of committing and attempting to commit the aggravated sexual assault of Maria Del Carmen Estrada, intentionally cause the death of Maria Del Carmen Estrada by strangling Maria

1

Del Carmen Estrada with a deadly weapon, namely a cord." 1 CR 23.[1]  The indictment further alleged that Mr. Shore did "while in the course of committing and attempting to commit the kidnapping of Maria Del Carmen Estrada, intentionally cause the death of Maria Del Carmen Estrada by strangling Maria Del Carmen Estrada with a deadly weapon, namely a cord." *Id.*

In October 2003, the trial court appointed counsel to represent Mr. Shore at trial. 1 CR 6. The case proceeded to trial. On October 21, 2004, the jury found Mr. Shore guilty as charged in the indictment. 3 CR 629. On October 27, 2004, the same jury answered "yes" and "no" to the two punishment special issues submitted pursuant to Article 37.071 of the Texas Code of Criminal Procedure. 3 CR 629-630. As required by Article 37.071, the trial court sentenced Mr. Shore to death by lethal injection. 35 RR 144-45.

The Texas Court of Criminal Appeals affirmed Mr. Shore's conviction and sentence on December 12, 2007. *Shore v. State*, No. AP-75,049, 2007 WL 4375939 (Tex. Crim. App. 2007). While his direct appeal was pending, Mr. Shore timely filed an application for writ of habeas corpus in the state convicting court, tolling the statutory deadline for filing a federal habeas petition. *See* 28 U.S.C. § 2244. The convicting court adopted the State's proposed findings of fact and conclusions of law verbatim. *Ex parte Shore*, No. 966,087-A (339th Dist. Ct., Harris County, Tex. Sept. 11 2012). The convicting court further declined to hold an evidentiary hearing and recommended that state habeas relief be denied. *Id.*; *Ex parte Shore*, No. WR-78,133-01, 2013 WL 173017 (Tex. Crim. App. Jan. 16, 2013). The Texas Court of Criminal Appeals accepted the recommendation, denying relief on January 16, 2013. *Ex parte Shore*, No. WR-78,133-01, 2013 WL 173017 (Tex. Crim. App. Jan. 16, 2013).

---

[1] Mr. Shore will cite the reporter's record of his trial proceedings as [volume number] RR [page number] and the clerk's record, which includes pre-trial motions and other documents filed in the trial court, as [volume number] CR [page number].

## STATEMENT OF FACTS

**A.      The jury finds Mr. Shore guilty of capital murder despite a number of evidentiary issues.**

In the guilt-innocence phase of Mr. Shore's trial, the State presented evidence to prove both of its two theories of capital murder: that Mr. Shore intentionally caused the death of Maria Del Carmen Estrada while in the course of committing and attempting to commit aggravated sexual assault and kidnapping.  The State built their case on two pieces of evidence that linked these crimes to Mr. Shore: Mr. Shore's statement in which he admitted to killing Ms. Estrada and DNA evidence found on Ms. Estrada's fingernail.  There was some controversy regarding both of these items.  Law enforcement managed to pry that confession out of Mr. Shore after nine hours of relentless interrogation, only the last hour of which was recorded.  15 RR 9, 53, 61. Even then, Mr. Shore admitted solely to the murder of Ms. Estrada and not to the equally necessary crimes of aggravated sexual assault and kidnapping.  *See* State's Exhibits 61, 61-A. This refusal to confess to the aggravated sexual assault and kidnapping is all the more noteworthy because Mr. Shore admitted to facts that could support charges of aggravated sexual assault and kidnapping regarding a number of his other victims.  *See* State's Exhibits 124, 165, 196.

As for the DNA evidence on the fingernail, the State repeatedly stated Mr. Shore's DNA was found on the inside of the fingernail rather than on top of the fingernail and argued that this indicated there was a struggle.  17 RR 119; 19 RR 22-26.  But the evidence did not back up that critical claim, as it was actually impossible to determine whether the DNA was under or merely on top of the fingernail because of the methods of collection and testing employed. 19 RR 22-26. The fingernails were soaked in a solution, and then the solution was tested for DNA, thus making it impossible to pinpoint the exact part of the fingernail that supplied the DNA.  19 RR 22-23.

In addition to those two pieces of evidence linking the crime to Mr. Shore, the State also presented other evidence in support of its theory.  The medical examiner testified that Ms. Estrada died as a result of strangulation, that she had a contusion in her vaginal area, and that the contusion combined with the state of her clothing indicated a sexual assault had occurred.  18 RR 110, 113, 116.  Additionally, one of the investigating officers, Sergeant Stuart Kennedy, testified that the technicians determined that sperm was found in Ms. Estrada's mouth, 17 RR 143, 154, but that hearsay testimony raised no objection from defense counsel and was not confirmed by the actual technicians when they testified in the trial. 18 RR 171-78 (testimony of Houston Police Department Crime Lab Quality Assurance Manager Reidun Hileman); 18 RR 178-182 (testimony of Houston Police Department Sergeant John Belk); 19 RR 19-21 (testimony of Orchid Cellmark analyst Katherine Long).  Further, the State's only real evidence of kidnapping was the testimony of a witness stating that Ms. Estrada would not get in a car with a stranger.  17 RR 186.

Mr. Shore's trial counsel presented no evidence during the guilt-innocence phase.  19 RR 86.  The jury found Mr. Shore guilty of the capital murder of Ms. Estrada as pleaded in the indictment, finding that Mr. Shore murdered Ms. Estrada in the course of committing or attempting to commit aggravated sexual assault or kidnapping. 24 RR 142-46.

**B.  During the punishment phase, Mr. Shore's counsel allows the State to present its case largely unchallenged and even asks the jury to sentence Mr. Shore to death.**

During the critical punishment phase of the trial, Mr. Shore's counsel joined the State in advocating for the death penalty.  Instead of presenting a mitigation case or performing effective cross-examinations of the State's witnesses, Mr. Shore's trial counsel opened the punishment phase of the trial by asking the jury to sentence Mr. Shore to death:

4

Anthony has asked on his behalf that we ask you to answer those questions in such a way that he's sentenced the death.

. . .

So throughout the course of this trial, unless there are legal matters that come up, Mr. Bourque and I are going to sit silent because we, too, agree that maybe the victims in this case need this forum to have their say.

21 RR 23-24, 26.

Trial counsel claimed that they took this highly unusual approach of essentially signing off on the State's death penalty case because Mr. Shore directed them to do so.  21 RR 23-24; 24 RR 113-14.  But the only statement on the matter in the record from Mr. Shore consists of four words in which he acknowledges that he directed his counsel to waive their closing arguments at punishment and instructed his counsel to direct the jury to sentence him to death.  *See* 24 RR 113-14 ("That is very accurate").  Neither the trial court nor the attorneys further explored the reasoning or scope of Mr. Shore's waiver.

This failure to investigate and develop the record on this key issue has left the record bereft of the setting and details of Mr. Shore's fateful choice.  The record is devoid of information regarding how Mr. Shore arrived at the decision.  Further, the only instructions Mr. Shore gave on the record were that his attorneys waive argument and ask the jury to sentence him to death.  Nowhere in the record does Mr. Shore direct his attorneys to not present mitigating evidence or cross-examine the State's witnesses.  Indeed, based on the fact that trial counsel loosely cross-examined some of the State's punishment witnesses, the record supports the conclusion that Shore's instructions, at the very least, did not prohibit counsel from engaging in cross-examination.  21 RR 54, 163; 22 RR 24, 55, 65, 72; 23 RR 178, 211.

Although, as noted above, the record is largely silent on the circumstances of Mr. Shore's decision, there are at least some things that are clear.  For starters, Mr. Shore made this life-and-

death choice based on an incomplete view of the punishment case his counsel could present. Trial counsel's mitigation investigation started off on the right foot in that they at least hired a mitigation specialist, Gina Vitale.  1 CR 13-22.  But Ms. Vitale's investigation was the definition of cursory.  She spent only a little over one hundred hours investigating the mitigation evidence that could be the difference between life and death for Mr. Shore.  Exhibit 1.  In this short amount of time, Ms. Vitale accomplished almost nothing.  Specially, she failed to contact all of Mr. Shore's immediate family members.  *See* Exhibit 4.  For example, she never contacted Mr. Shore's father, Robert Shore.  Exhibit 4.  Continuing this trend, neither trial counsel nor Ms. Vitale ever had a mental health professional interview Mr. Shore in hopes of uncovering mitigating evidence.

In addition to the sloppy mitigation investigation, the record also demonstrates that Mr. Shore was still clawing at any opportunity to save his own life a mere few months before trial.  It was at that point in time that Ms. Vitale reported to trial counsel that Mr. Shore was trying to determine whether "there was any possibility of a deal if he accepted four life sentences." Exhibit 2.  Ms. Vitale additionally noted that she thought Mr. Shore was "getting scared" at the prospect of losing his life.  *Id.*  Ms. Vitale commented again on the late timing of Mr. Shore's change of heart in one of her invoices dated October 31, 2004, a few days after Mr. Shore's trial had ended: "Judge Cosper is going to have a stroke! [Mr. Shore] should have decided not to mount a defense long before and it would have saved everyone a lot of time and money.  Oh well, until next time . . . ."  Exhibit 1.  Thus, even at the eve of trial Mr. Shore had not yet accepted death or called off all efforts at a mitigation case.  But later on, against the backdrop of his counsel's pitiful effort at a mitigation investigation, Mr. Shore ultimately decided that it might be better to just ask the jury to sentence him to death.  22 RR 114.

Even within the confines of Mr. Shore's instructions, Mr. Shore's trial counsel did hardly anything to contest the State's punishment case.  Other than asking the jury to sentence Mr. Shore to death, trial counsel's contributions at this stage consisted mainly of the haphazard cross-examination of a few witnesses and some legal objections.  21 RR 54, 163; 22 RR 24, 55, 65, 72; 23 RR 178, 211.  Trial counsel did not put on any mitigation evidence on behalf of Mr. Shore, and they even failed to cross-examine a number of the State's key witnesses.  24 RR 112-14, 121-22 (no mitigation evidence on behalf of Mr. Shore); *see, e.g.*, 21 RR 66, 75, 193, 249, 269 (failure to cross-examine witnesses).  This one-toe-in-the-water mitigation strategy confused the jury and the record, especially in light of counsel's earlier declaration that they intended to do nothing during the punishment phase.

At the conclusion of this one-sided affair, the jury, having been absolved of responsibility of their decision by Mr. Shore's trial counsel, found that Mr. Shore should receive the death penalty.  24 RR 142-48.  Trial counsel's neglect in its failure to perform a full mitigation investigation, to thoroughly cross-examine the State's witnesses, and to present mitigation evidence without question left the jurors feeling that they had no choice but to sentence Mr. Shore to death.

### C. Mr. Shore's problems with legal representation continue when his state habeas counsel fails him as well.

Mr. Shore's problems with counsel continued in his state habeas proceeding.  Jules Laird was appointed as Mr. Shore's State habeas counsel.  Mr. Laird committed many of the same investigative oversights as trial counsel, including failing to have a mental health expert interview Mr. Shore.  Mr. Laird also failed to keep Mr. Shore updated about the progress of his case.  This neglect of duty even compelled Mr. Shore to write to the court asking that they not accept Mr. Laird's filings because Mr. Shore had not approved them.  Exhibit 6.  Mr. Laird did

not even inform Mr. Shore that his petition had been denied.  Mr. Laird also ignored an inquiry

from Bob Wicoff, the individual in charge of reviewing the cases affected by the Houston Police

Department Crime Lab and Property Room scandal.  Exhibit 3.  Mr. Wicoff had identified Mr.

Shore's case as one of those affected by the scandal and offered to help investigate further.  *Id.*

However, Mr. Laird did not even respond to Mr. Wicoff's attempt at making contact.  *Id.*

Further, Mr. Laird failed to fulfill his legal obligation of filing a motion for the appointment

federal habeas counsel for Mr. Shore after the Texas Court of Criminal Appeals denied Mr.

Shore's petition.  *See* TEX. CODE CRIM. PROC. art. 11.071 § 2(e).  Mr. Laird continued to obstruct

efforts at Mr. Shore's defense on federal habeas review, refusing to turn over his file to federal

habeas counsel for many months after the initial request.

## ARGUMENT

I.  **Mr. Shore's Death Sentence Violates The Eighth And Fourteenth Amendments Because His Mental Illness And Brain Defects Reduce His Culpability For His Actions.**

A.  **The Eighth and Fourteenth Amendments prohibit the execution of the severely mentally ill and those with certain types of brain defects.**

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court held that the

Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution

of the mentally retarded, and in *Roper v. Simmons*, 543 U.S. 551 (2005), the Court held that the

Eighth Amendment further prohibits the execution of those under the age of eighteen. The

Court's rationale in *Atkins* and *Roper* applies with equal force to persons with severe mental

illness or who possess certain brain defects, such as Mr. Shore.

> 1.  **Infliction of capital punishment upon individuals who were severely mentally ill or had certain brain defects at the time of the offense makes no measurable contribution to the acceptable goals of punishment.**

The United States Supreme Court has repeatedly held that the death penalty violates the Eighth Amendment when it "'makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering . . . .'" *Penry v. Lynaugh*, 492 U.S. 302, 335 (1989) (quoting *Coker v. Georgia*, 433 U.S. 584, 592 (1977)).  The Court has identified "'two principal social purposes'" served by capital punishment: "'retribution and deterrence of capital crimes . . . .'" *Penry*, 492 U.S. at 335-36 (quoting *Gregg v. Georgia*, 428 U.S. 153, 183 (1976)).  In *Enmund v. Florida*, 458 U.S. 782 (1982), the Court held that, "[u]nless the death penalty when applied to those in [the defendant's] position measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment."  *Enmund v. Florida*, 458 U.S. 782, 798 (1982).

In *Atkins* and *Roper*, the Court held that the death penalty, when applied to the mentally retarded and minors, respectively, advances neither of these goals. *Roper*, 543 U.S. at 571-72; *Atkins*, 536 U.S. at 319-20.  The Court's reasoning in these two cases dictates that capital punishment inflicted on individuals who were mentally ill or had certain brain defects at the time of the offense makes no measurable contribution to the acceptable goals of punishment and fails to serve any legitimate penal purpose more effectively than a less severe penalty.  Thus, under the Court's precedent, executing an individual who was severely mentally ill or had certain brain defects at the time of the offense violates the Eighth Amendment.

Executing those who had severe mental illness or certain brain defects at the time of the offenses serves neither retribution nor deterrence.  Starting with retribution, the Supreme Court

9

has recognized that "'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse.'" *Penry*, 492 U.S. at 319 (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)); *see also Eddings*, 455 U.S. at 113-15 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (plurality opinion). The Court has also stated that "retribution as a justification for executing [offenders] very much depends on the degree of [their] culpability . . . ." *Enmund*, 458 U.S. at 800. Moreover, culpability is not based solely upon the magnitude of harm resulting from the offense. "For purposes of imposing the death penalty . . . punishment must be tailored to [a defendant's] personal responsibility and moral guilt." *Id.* at 801.

The rationale of the Court's acceptance in *Atkins* that mentally retarded murderers are so lacking in moral blameworthiness as to be ineligible for the death penalty is instructive. The Court focused on the relative culpability of mentally retarded persons to the average murderer: "If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution." *Atkins*, 536 U.S. at 319. The Court further explained the reasons for the reduced culpability of mentally retarded persons:

> Because of their impairments . . . [mentally retarded persons] have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others . . . . Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Atkins*, 536 U.S. at 318.

The Court echoed these sentiments in *Roper*, this time in the context of holding that minors lack the culpability necessary to be eligible for the death penalty:

> The same conclusions follow from the lesser culpability of the juvenile offender. Whether viewed as an attempt to express the community's moral outrage or as an attempt to right the balance for the wrong to the victim, the case for retribution is not as strong with a minor as with an adult. Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity.

*Roper*, 543 U.S. at 571.

These characterizations apply with equal force to those who suffered from severe mental illness at the time of the offense or had certain brain defects that reduced their ability to control their impulses or make rational choices.  These individuals are less culpable than the average murderer because these illnesses or brain defects both explain their behavior and reduce their ability to control it.  *See Bigby v. Dretke*, 402 F.3d 551, 571 (5th Cir. 2005) (Petitioner's "history of mental illness was relevant to whether he acted deliberately [and] also spoke to his moral culpability" where mental illness caused defendant "to suffer delusions with respect to the actions and motivations of the people around him, could not be adequately treated, and significantly impacted his interpersonal relationship abilities.").

Moreover, lessened maturity and volitional control was a central component of the Court's determination that the execution of juvenile offenders violates the Eighth Amendment. *Thompson v. Oklahoma*, 487 U.S. 815, 834 (1988) ("Crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults."); *see also Roper v. Simmons*, 543 U.S. 551, 571 (2005) ("Retribution is not

proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity.").

By the same token, often persons experiencing symptoms of mental illness or who have certain brain defects have a reduced ability to control their actions that are arguably even more substantial than the developmental shortcomings of sixteen and seventeen year olds. If juveniles and the mentally retarded warrant exemption from capital punishment due to their cognitive and behavioral limitations, so, too, do persons who were seriously mentally ill or had certain brain defects at the time of their offense. Because of their significantly reduced moral culpability, the execution of this class of persons does not advance the goal of retribution.

The other principal goal of capital punishment, deterrence, also finds no champion in the execution of individuals who were severely mentally ill or had certain brain defects at the time of their offense.  The Court made this plain in *Atkins* and *Roper*.   In *Atkins*, the Court stated the "cold calculus" of cost and benefit analysis is not compatible with the mental functioning of mentally retarded individuals.    *Atkins*, 536 U.S. at 319-20.   The Court made a similar observation about minors in *Roper*, deciding that "it is unclear whether the death penalty has a significant or even measurable deterrent effect on juveniles" and noting that "the absence of evidence of deterrent effect is of special concern because the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence."  *Roper*, 543 U.S. at 571; *see also Thompson*, 487 U.S. at 837 (observing that "the likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent").  Additionally, as Justice Powell observed, "the death penalty has little deterrent force against defendants who

have reduced capacity for considered choice." *Skipper*, 476 U.S. at 13 (Powell, J., concurring) (citing *Eddings*, 455 U.S. at 115 n.11).

The same is true for those who are severely mentally ill or suffer from certain brain defects at the time of their offenses.  As with juveniles and the mentally retarded, the severely mentally ill and those with certain brain defects are not meaningfully deterred by the threat of capital punishment.  Indeed, it is the very fact that these individuals cannot exercise normal control over their actions or engage in a normal decisional calculus that leads to the offenses.

In sum, the death penalty can serve no legitimate purpose when applied to defendants who are seriously mentally ill at the time of the offense.  In such circumstances, the death penalty amounts to the purposeless infliction of needless pain and suffering because it fails to advance either retribution or deterrence.

> 2.     **Like mental retardation, aspects of severe mental illness and certain brain defects undermine the strength of the procedural protections that our capital jurisprudence steadfastly guards.**

In *Atkins*, the Court pointed to "the reduced capacity" of mentally retarded offenders as a justification for a categorical bar against their execution. "The risk 'that the death penalty will be imposed in spite of factors which may call for a less severe penalty' . . . is enhanced," in part, "by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation . . . ." *Atkins*, 536 U.S. at 320 (quoting *Lockett*, 438 U.S. at 605).  "Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Atkins*, 536 U.S. at 320.

Moreover, mental retardation as a mitigating factor can act as a "two-edged sword" by increasing the likelihood the defendant will be found a future danger by the jury. *Id.* at 321.  This concern is equally applicable to mentally ill defendants.  Juries and judges, like people generally,

harbor hostile attitudes toward people with mental disability, particularly one that played a role in causing the person to commit a heinous crime.  Numerous studies document that capital sentencing juries tend to devalue evidence of significant mental disorder, often treating it as an aggravating circumstance rather than a mitigating one.[2]  And prosecutors routinely play to this bias.

In its Position Statement on Diminished Responsibility in Capital Sentencing, the American Psychiatric Association voiced its concern that juries commonly misapply evidence of severe mental illness:

> Even though defendants with mental illness are entitled to introduce mental health evidence in mitigation of sentence, commentators on capital sentencing have often observed that juries tend to devalue undisputed and strong evidence of diminished responsibility in the face of strong evidence in aggravation. Indeed, such evidence is often a double-edged sword, tending to show both impaired capacity as well as future dangerousness.

Am. Psychiatric Ass'n, Position Statement: Diminished Responsibility in Capital Sentencing (2004), *available at* http://www.psych.org/advocacy--newsroom/position-statements.

---

[2] Christopher Slobogin, *Mental Disorder as an Exemption from the Death Penalty: The ABA-IRR Task Force Recommendations*, 54 Cath. U. L. Rev. 1133, 1150-51 (2005); Am. Psychiatric Ass'n, Position Statement: Diminished Responsibility in Capital Sentencing (2004), *available at* http://www.psych.org/Departments/EDU/Library/APAOfficialDocumentsandRelated/PositionStatements/200406.aspx (citing Phyllis Crocker, *Concepts of Culpability and Deathworthiness: Differentiating between Guilt and Punishment in Death Penalty Cases*, 22 Fordham L. Rev. 21 (1997); Richard J. Bonnie & C. Robert Showalter, *Psychiatrists and Capital Sentencing: Risks and Responsibilities in a Unique Legal Setting*, 12 Bull. Am. Acad. Psychiatry & L. 159-67 (1984)); *see also* John Parry, *The Death Penalty and Persons with Mental Disabilities: A Lethal Dose of Stigma, Sanism, Fear of Violence, and Faulty Predictions of Dangerousness*, 29 Mental & Physical Disability L. Rep. 667, 667 & n.7 (2005) (criticizing the "misconception that persons with mental illness are inherently violent and are generally dangerous to themselves or others") (citing John Monahan & Jean Arnold, *Violence by People with Mental Illness: A Consensus Statement by Advocates and Researchers*, 19 Psychiatric Rehabilitation J. 67 (1996); Patrick W. Corrigan *et al.*, *Implications of Educating the Public on Mental Illness, Violence, and Stigma*, 55 Psychiatric Services 577 (2004); John Junginger & Lynanne McGuire, *Psychotic Motivation and the Paradox of Current Research on Serious Mental Illness and Rates of Violence*, 30 Schizophrenia Bull. 21 (2004)).

The Supreme Court has noted that a state may not attach the aggravating label "to conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness." *Zant v. Stephens*, 462 U.S. 862, 885 (1983). The Court cited *Miller v. State*, 373 So. 2d 882, 885-86 (Fla. 1979), which found a constitutional violation where it was "clear from the trial judge's sentencing order that he considered as an aggravating factor the defendant's allegedly incurable and dangerous mental illness." *Miller v. State*, 373 So. 2d 882, 885-86 (Fla. 1979). There is thus a heightened risk that a jury will treat evidence of mental illness as an aggravating factor based on a misunderstanding of future dangerousness. The Eighth and Fourteenth Amendments require that such decisions be removed from the purview of the jury.

Capital juries are likely to treat mental illness as aggravating because they incorrectly assume that mental illness increases future dangerousness. Lay persons are ill-equipped to appreciate the role of mental illness in behavior. Misuse of mental illness evidence unbalances the process by which mitigating and aggravating factors are weighed and impermissibly increases the chances that a mentally ill offender will receive the death penalty. As with juvenile offenders and the mentally retarded, only a categorical ban on executing offenders who were severely mentally ill at the time of the crime can adequately protect their constitutional rights.

Indeed, mentally ill offenders require more such protection than other groups, precisely because of the stigma and misunderstanding surrounding their impairments. In short, it is not enough to allow jury consideration of mental illness as mitigation. Rather, as with mental retardation, the Court must read the Eighth Amendment to contain a categorical exemption for those who were mentally ill or had certain brain defects at the time of their offense.

15

**B.     There is reason to believe that Mr. Shore was severely mentally ill and had brain defects at the time of his offense.**

There is reason to believe the Mr. Shore is severely mentally ill and has brain defects. There are a number of troubling incidents in Mr. Shore's history that suggest that he has always had trouble controlling his actions, either due to a mental illness, a brain defect, or both.  For example, Mr. Shore's sister testified that he drove a screwdriver through her head when he was a young child and also that he killed a kitten around that same time.  *See* 21 RR 38-39.  These are at the very least signs of mental illness that call out for investigation, an investigation that should have been performed by trial counsel or by state habeas counsel.  Unfortunately and unjustly, this was not done, and it was left for undersigned federal habeas counsel to do this job.

The exact factual details of Mr. Shore's mental illness or brain defect are not yet known. Undersigned counsel for Mr. Shore were appointed to the case only a month before the statutory deadline for filing the petition.  Counsel has consulted with mental health experts about Mr. Shore, and has engaged a psychiatrist to interview and evaluate Mr. Shore.  Counsel is also investigating whether Mr. Shore has any brain defects that would reduce his impulse-control and decisionmaking abilities.  Counsel plans to later amend this petition with the results of these investigations.

**II.     Mr. Shore Was Deprived Of His Right Under The Sixth And Fourteenth Amendments To Effective Assistance Of Counsel In the Punishment Phase Through Trial Counsel's Failure To Conduct A Reasonable Mitigation Investigation And Contest The State's Punishment Case.**

**A.     The Constitution guarantees a defendant the right to effective assistance of counsel in both the guilt-innocence and punishment phases of a capital trial.**

The United States Constitution guarantees a defendant the right to a fair trial through the Sixth, Tenth, and Fourteenth Amendments, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, which includes the Counsel Clause:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

U.S. CONST. amend. VI; *see also Strickland v. Washington*, 466 U.S. 668, 685 (1984).

A fair trial, as the Supreme Court recognized in *Strickland*, "is one in which evidence subject to *adversarial testing* is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." *Id* (emphasis added). And "[t]he right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution to which they are entitled.'" *Id*. (emphasis added) (quoting *Adams v. United States, ex rel. McCann*, 317 U.S. 269, 275, 276 (1942)). Put another way, "[t]he purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Id*. at 691-92; *see also id*. ("The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results."); *Williams v. Taylor*, 529 U.S. 362, 375 (2000) ("[Constitutional] errors that undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ." (citing *Teague v. Lane*, 489 U.S. 288, 311-14 (1989)).

For this reason, the Supreme Court has long recognized that "the right to counsel is the right to the *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) (emphasis added) (citing *Reece v. Georgia*, 350 U.S. 85, 90 (1955); *Glasser v. United States*, 315 U.S. 60, 69-70 (1942); *Avery v. Alabama*, 308 U.S. 444, 446 (1940); and *Powell v. Alabama*, 287 U.S. 45, 57 (1932)). And a defendant is deprived of this constitutionally

guaranteed right when his attorney fails to render "adequate legal assistance."  *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980).

The Supreme Court has also held that the Sixth Amendment's guarantee of effective assistance extends to both guilt-and-innocence phase and a capital sentencing phase; and that "the same standard for evaluating claims of ineffective assistance of counsel applies to trials and to capital sentencing proceedings because, 'a capital sentencing proceeding . . . is sufficiently like a trial in its adversarial format and in the existence of standards for our decision . . . that counsel's role in the proceeding is comparable to counsel's role at trial.'"  *Caspari v. Bohlen*, 510 U.S. 383, 393 (1994) (quoting *Strickland*, 466 U.S. at 686-87 (1984)).

**B.     An ineffective assistance of counsel claim has two prongs: performance and prejudice.**

Under *Strickland v. Washington*, there are two components to a convicted defendant's claim that his trial counsel's assistance was so defective as to require reversal of his conviction or death sentence.  "First, the defendant must show that counsel's performance was deficient," which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687. And "[s]econd, the defendant must show that the deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id*.  "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."  *Id*.

To successfully meet the first *Strickland* component, a defendant must show that his "counsel's representation fell below an objective standard of reasonableness," to be judged "under prevailing processional norms" "at the time" legal representation was rendered, and

"considering all the circumstances." *Id.* at 688; *see also Porter v. McCollum*, 558 U.S. 30, 39 (2009) (evaluating this performance prong "under the prevailing professional norms at the time of [defendant's] trial"). While the *Strickland* Court was loath to articulate precise guidelines regarding what constitutes reasonable representation, it did explain that among the "basic duties" demanded of an attorney representing a criminal defendant are (1) the duty "to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution," and (2) the "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S at 688-91.

To successfully meet the second *Strickland* component, the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* And this prejudice inquiry "finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution . . . ." *Id.* (citing *United States v. Agurs*, 427 U.S. 97, 104, 112-13 (1976)).

It is important to emphasize that *Strickland*'s prejudice inquiry is not outcome determinative: "[A] defendant need *not* show that [his] counsel's deficient conduct more likely than not altered the outcome in [his] case." *Id.* at 693. As the *Strickland* Court noted, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694. Thus, to make "reasonable probability" showing is only to demonstrate a probability sufficient to undermine confidence in a case's outcome—a burden significantly lower than that imposed by the preponderance of the evidence standard.

19

The Supreme Court reiterated this point sixteen years after *Strickland* in *Williams v. Taylor*, where it explained that a state court's use of the "preponderance of the evidence" standard in lieu of the lesser "reasonable probability" standard would result in a decision that was contrary to federal law as determined by the Supreme Court.  529 U.S. 362, 405-06 (2000) ("If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different.'"  (citing *Strickland*, 466 U.S. at 694)).[3]

There are a few nuances in the prejudice standard that manifest when applying the prejudice prong to a particular case.  First, in determining whether an attorney's errors resulted in the required prejudice, a court should presume that the jury acted according to law.  *Strickland*, 466 U.S. at 694.  In other words, "[t]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."  Thus, the law itself, *i.e.*, "the standards that govern the

---

[3] The Fifth Circuit has likewise recognized that the prejudice prong imposes "a lower burden of proof than the preponderance standard."  *Bouchillon v. Collins* 907 F.2d 589, 595 (5th Cir. 1990) (noting also that "even if [the defendant] were to fail to [meet the] preponderance of the evidence [standard] . . . it is still possible that he raised sufficient doubt on [the] issue to satisfy the prejudice prong of his ineffective assistance of counsel claim."); *see also Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) (characterizing *Strickland*'s "reasonable probability" of prejudice standard as "somewhat less than a preponderance of the evidence"); *Hodge v. Hurley*, 426 F.3d 368, 376 n.18 (6th Cir. 2005) (explaining that *Strickland*'s standard "is a lesser standard than preponderance of the evidence").

[sentencing] decision," must be considered when determining whether there is a probability of prejudice sufficient to undermine confidence in the outcome of the sentencing proceeding.

The prejudice inquiry is therefore case specific, in that it is an attempt to assess the effect that trial counsel's constitutionally deficient performance had on the reliability of a particular proceeding's outcome.  In many death penalty states, sentencing laws require the sentence in a capital case—*i.e.*, whether a defendant is sentenced to life, or death—to be determined by weighing aggravating factors found by the decision maker against mitigating factors found by the decisionmaker. If the jury determines that the mitigating factors outweigh the aggravating ones, the jury is instructed to return a sentence of life.  But if the jury determines that the mitigating factors are outweighed by the aggravating factors, then the jury is instructed to return a sentence of death.  In those states, the appropriate inquiry is "whether there is a reasonable probability that, absent the errors, the sentence . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S. at 695.

A court reviewing a death sentence in Texas, however, would not ask this question because the sentencing laws governing Texas capital trials do not require a decisionmaker to balance aggravating factors against mitigating factors when deciding what penalty to assess. Instead Texas juries are required to render answers to two "special issues."[4]  The special issues are questions of fact to which the jury must answer "Yes" or "No."  Depending on how these questions are answered, the court sentences the defendant to either life without parole, or death.

---

[4] In a minority of cases, the sentencing jury must answer three questions.  The third question asks whether the defendant intended or anticipated loss of life.  The jury is only given this third special issue when the jury was charged in the guilt phase under (a) Texas's law of parties to offenses and (b) Texas's law of criminal responsibility for the conduct of another.  *See* Tex. Code Crim. Proc. art. 37.071, § 2(b)(2).  The third special issue is not applicable to the instant case.

The first special issue a Texas capital jury must answer is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  Tex. Code Crim. Proc. art. 37.013, § 2(b)(1).  If the jury answers this question affirmatively, it must then answer a second special issue, "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed."  *Id*. art. 37.071, § 2(e)(1).[5]  On this second special issue the jury "consider[s] mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."  *Id*. art. 37.071, § 2(f)(4).  And further, the jury members "need not agree on what particular evidence supports an affirmative finding on the issue."  *Id*. art. 37.071, § 2(f)(3).

If the jury answers "yes" to the first special issue, and "no" to the second special issue, the trial court must impose a sentence of death.  *Id*. art. 37.071, § 2(g).  For any other combination of answers—including the inability of the jury to unanimously agree on an answer for any question—the trial court must assess a sentence of life.  *Id*. *see also id*. art. 37.071, § 2(d)(2) (jury must unanimously answer "yes" on the first special); *id*. art. 37.071, § 2(f)(2) (jury must unanimously answer "no" on the second special issue).  In light of these standards governing death sentences in Texas, the question in this case is whether there is a reasonable

---

[5] After answering the first special issue "yes" there is a presumption that the defendant will be sentenced to death.  This presumption is overcome only if the defendant can persuade the jurors that there exist sufficient mitigating circumstances to warrant a sentence of life in prison without the possibility of parole rather than a death sentence.  By shifting the burden of proof to the defendant to establish mitigation, the sentencing scheme violates the due process clause of the constitution. *In re Winship*, 397 U.S. 358, 364 (1970); *see also Sandstorm v. Montana*, 442 U.S. 510, 524 (1979).

probability that, absent counsel's errors, the jury would have answered either of the two special issues differently.  *See Lewis v. Dretke*, 355 F.3d 364, 369 (5th Cir. 2003) (relevant question is whether the totality of the evidence "would have affected the sentencing decision of at least one juror").

Second, in making the prejudice determination, a court "must consider the totality of the evidence before the . . . jury" and then assess the effect the errors might have had on any of the fact findings made by the sentence.  *Strickland*, 466 U.S. at 695.  As the Supreme Court observed in *Strickland*:

> Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id*. at 695-96.  Thus, a court reviewing how counsel's errors affected the punishment phase of a Texas capital sentencing proceeding must examine the relevant special issue to determine whether and to what extent it may have been affected by the error in light of all the evidence before the jury.

Texas's Court of Criminal Appeals affirmed the above analytical framework for reviewing the prejudice prong of an ineffective assistance claim in the punishment phase of a Texas capital trial in *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006).  There, the Court wrote:

> [T]he applicant must show that counsel's performance prejudiced his defense at trial.  In order to satisfy this prong, an applicant must show there was a reasonable probability that, absent the errors, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.  Texas'

capital sentencing scheme does not involve the direct balancing of aggravating and mitigating circumstances.  It asks the jury to answer a mitigation issue.  We have adapted the Supreme Court's prejudice test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Id*. at 393-94 (footnotes omitted) (quoting *Strickland*, 466 U.S. at 694).  In making the prejudice inquiry, the court "consider[s] the totality of the evidence, 'both that adduced at trial, and the evidence adduced in the habeas proceeding[s].'"  *Id*. at 398 (citing *Wiggins v. Smith*, 539 U.S. 510, 536 (2003)).  The *Gonzales* court ultimately determined that the defendant at issue had suffered prejudice from his counsel's failure to locate and present mitigating evidence because "the applicant's mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of the applicant's moral culpability."  *Id*. at 399 (quoting *Wiggins*, 539 U.S. at 538).

From 2000 to 2005, the Supreme Court decided three cases addressing the effective representation at the sentencing phase of a capital trial: *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Rompilla v. Beard*, 545 U.S. 374 (2005).  This trio of decisions addressed death penalty cases tried in the 1980s, and in each instance the Court held that the *Strickland*'s clearly established law required a finding of ineffective assistance of counsel.  These cases have articulated "performance" and "prejudice" principles that are applicable to post *Strickland* capital cases adjudicated in state courts and constitute "clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254 (d)(1).  The standards established in these cases will be further explored below, as they will guide application of the performance and prejudice prongs to the instant case.

### C.    Mr. Shore's counsel was constitutionally ineffective during the punishment phase of his trial.

Capital defense is sufficiently specialized and regulated to have a national standard, reflected both in the Sixth Amendment and the ABA Guidelines.  *Rompilla*, 545 U.S. at 387;

*Wiggins*, 539 U.S. at 524.   While there is no set of *per se* rules or a checklist for capital representation, the ABA Guidelines are evidence of the "well-defined norms" of the national standard for mitigation investigation.  *Wiggins*, 539 U.S. at 524.[6]  These standards mandate that counsel fulfill certain basic duties.  *Id.*  Mr. Shore's trial counsel failed to perform such duties.

The American Bar Association's revised *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, published in 2003—the year prior to Mr. Shore's criminal trial—lay out the professional norms that capital defense counsel must abide by, and should have abided by during the sentencing phase of Mr. Shore's trial.  Am. Bar. Ass'n, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. 2003), reprinted in 30 Hofstra L. Rev. 913, 1027 (2003) (hereinafter "ABA Guidelines"); *see also Porter v. McCollum*, 558 U.S. 30, 39 (2009) ("It is unquestioned that under the prevailing professional norms at the time of Porter's [1988] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'") (quoting *Williams v. Taylor,* 529 U.S. 362, 396 (2000)).  The Supreme Court has long referred to the ABA's Guidelines as "guides to determining what [performance] is reasonable."  *Wiggins*, 539 U.S. at 524 (quoting *Strickland*, 466 U.S. at 688); *see also Rompilla*, 545 U.S. at 387 & n.7 (2005).  And while the Guidelines are only guides, not "inexorable commands" by which all capital defense counsel must fully comply, *Bobby v. van Hook*, 558 U.S. 4, 8 (2009), the standards remain "valuable measures of the prevailing professional norms of effective

---

[6] *See also Rompilla*, 545 U.S. at 387 ("We have long referred to th[e] ABA Standards as guides to determining what is reasonable.") (internal alterations and quotation marks omitted); *Williams*, 529 U.S. at 396 (citing the ABA Standards for Criminal Justice for the proposition that "trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background"); *Strickland*, 466 U.S. at 688 ("Prevailing norms of practice as reflected in the American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4–1.1 to 4–8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable . . . .").

representation . . . ."  *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010).  The State Bar of Texas has similarly issued guidelines that "articulate the statewide standard of practice for the defense of capital cases" in Texas, the nation's most active death penalty state.  State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel*, reprinted in 69 Tex. Bar. J. 966, 967 (2006) (hereinafter "SBOT Guidelines").

       1.       **Mr. Shore's trial counsel failed to conduct a reasonable and thorough mitigation investigation.**

Although some form of a mitigation investigation occurred in connection with Mr. Shore's sentencing, that investigation was so deficient as to fall to the level of constitutional inadequacy.  *See Rompilla*, 545 U.S. at 388-98 (explaining that performance of some investigation, or even an extensive investigation, does not preclude a finding of deficient performance with respect to further investigation that reasonably should have been conducted under the circumstances); *Wiggins*, 539 U.S. at 527, 534.  Mr. Shore's federal habeas counsel has conducted and is continuing to conduct an extensive mitigation investigation on Mr. Shore's behalf, including an investigation into Mr. Shore's family and social history and Mr. Shore's mental health.  Pursuant to the ABA Guidelines and the professional norms in place at the time of Mr. Shore's trial, Mr. Shore's trial counsel's performance at the sentencing phase was deficient for several reasons, including: (1) failure to engage and deploy experts to assist in the mitigation investigation effectively; and (2) failure to conduct a thorough investigation of Mr. Shore's family and social history as well as Mr. Shore's mental health.

Starting with trial counsel's failures on the mitigation expert front, the ABA Guidelines state that the "core" team that the lead capital defense counsel should assemble immediately upon appointment should include at least one mitigation specialist and one fact investigator.  ABA Guideline 10.4(C), at 999; SBOT Guideline 10.1(B), at 970.  "Lead counsel bears overall

responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with [the ABA] Guidelines and professional standards." ABA Guidelines 10.4(B), at 9999; SBOT Guideline 10.1(A), at 970. Moreover, the use of a qualified mitigation specialist has become part of the well-established standard of care, and ensures that a reasonable mitigation investigation is conducted. ABA Guideline 4.1(B) comment, at 960; *see* SBOT Guideline 10.1(B)(2)(b), at 970.

"The investigation into a client's life history must survey a broad set of sources and includes . . . medical history; complete prenatal, pediatric and adult health information; . . . mental health history; history of maltreatment and neglect; trauma history; educational history; . . . multi-generational family history, genetic disorders and vulnerabilities, as well as multigenerational patterns of behavior . . . ." Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases Guideline 10.11(B), *reprinted in* 36 HOFSTRA L. REV. 677, 689 (2008). "[A]n understanding of the client's extended, multi-generational history is often needed for an understanding of his functioning . . . " ABA Guidelines 10.11 cmt., at 1061.

The record shows that Mr. Shore's trial counsel's primary expert for the punishment phase was Gina Vitale, a mitigation investigator. Ms. Vitale was an odd choice for a capital case because at the time she was relatively new to the field, possessing only three years of experience as a mitigation investigator. Exhibit 5. Although Mr. Shore's trial counsel retained Ms. Vitale, Mr. Shore's trial counsel did not direct her to conduct the mitigation investigation that is constitutionally required. The billing records indicate that Ms. Vitale did not devote nearly the time necessary to conduct a constitutionally sufficient mitigation investigation. Ms. Vitale's billing records (which were filed with the trial court) indicate that she spent only a little over one

hundred hours working on the case, and only a minority of that time was spent interviewing witnesses. Exhibit 1. Instead, much of Ms. Vitale's time was spent meeting with Mr. Shore personally, leaving precious little time for the broad mitigation investigation that the ABA Guidelines require. *Id.* Even for the individuals Ms. Vitale did contact, her interviews were short, superficial, and yielded nothing usable. Further, Ms. Vitale tended to give up easily, failing to display the patience and persistence often needed in the delicate task of conducting a mitigation investigation. Finally, neither trial counsel nor Ms. Vitale looked into the years between Mr. Shore's last criminal act and his capital murder arrest for an indication as to what caused this change in behavior. The background investigation forms the core of the mitigation investigation, and failure to conduct it thoroughly constitutes constitutionally deficient performance. *Williams*, 529 U.S. at 396 (noting that trial counsel failed to "fulfill their obligation to conduct a thorough investigation of the defendant's background").[7] The investigation conducted by trial counsel here was clearly deficient.

As part of their independent mitigation investigation, Mr. Shore's federal habeas corpus counsel conducted extensive interviews with Mr. Shore and subsequently contacted the persons likely to be aware of relevant information concerning Mr. Shore. By way of example, these persons include Mr. Shore's immediate family members, former romantic interests, and business associates. In connection with this investigation, Mr. Shore's federal habeas corpus counsel discovered that Mr. Shore's trial mitigation expert had conducted no more than a handful of interviews with key witnesses and determined that the interviews she did conduct were superficial and limited. Indeed, even Mr. Shore's father informed Mr. Shore's federal habeas

---

[7] *See also Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam) (trial counsel's performance was constitutionally deficient where he "did not even take the first step of interviewing witnesses or requesting records").

counsel that he had not been contacted by Ms. Vitale and had only one brief meeting with trial counsel.  Exhibit 4.  Federal habeas counsel is continuing to pursue this investigation and do the work that trial counsel was ethically bound to do.

> **2.    Mr. Shore's trial counsel failed to adequately contest the State's punishment case by engaging in effective cross-examination and presenting mitigation evidence.**

Mr. Shore's trial counsel's performance at the punishment phase of the trial fell woefully short of the mark.  At commencement of the punishment phase, Mr. Shore's trial counsel unbelievably took the side of the State and became a second prosecutor in the courtroom.  Trial counsel informed the jury that "[Mr. Shore] has asked on his behalf that we ask you to answer those [special interrogatory] questions in such a way that he's sentenced to death."  21 RR 23-26. Mr. Shore's trial counsel went on further to essentially adopt the position of the prosecution by negating the notion that there was any useful mitigating evidence: "[T]he evidence is going to show [that Mr. Shore] has no explanation for why he is the way he is.  He has no explanation for what he has done."  21 RR 24.  Trial counsel assured the jury that "throughout the course of this trial, unless there are legal matters that come up, [Mr. Shore's trial counsel] are going to sit silent because we, too, agree that maybe the victims in this case need this forum to have their say."  21 RR 26.  It was at this point that trial counsel clearly crossed the line between relaying his client's supposed wishes and agreeing with them.  The jury witnessed Mr. Shore's own attorney—the person with the highest obligation to defend his interests—apparently agree that the victims should have their say and that Mr. Shore should be sentenced to death.  This was an abandonment of trial counsels' sworn duties as attorneys and as members of the bar.  *See* Tex. Disciplinary R. Prof'l Conduct Preamble, ¶ 2; American Bar Assoc., Model Rules Prof'l Conduct, Preamble and Scope, ¶ 2.

In addition to adopting the State's position on the key punishment issues, trial counsel also failed to present any mitigation evidence or effectively cross-examine the State's witnesses. For example, trial counsel failed to challenge Regina Shore-Belt, Mr. Shore's sister, on her recollection of Mr. Shore's killing of a kitten and assaulting her with a screwdriver at a young age. 21 RR 38-39, 54-56. This was an issue that cried out for cross-examination because Regina was the only source for these prejudicial stories, and she was only two or three years of age at the time they supposedly occurred. 21 RR 32, 38-39. Yet trial counsel refused to engage. 21 RR 54-56. Equally troubling is that trial counsel was unfocused and ineffective even when they did deign to cross-examine some of the State's punishment witnesses. *See, e.g.*, 21 RR 54-56, 163-170; 22 RR 24-25, 55-58. All of this resulted in quite a bizarre spectacle, a clinic for what not to do at the punishment stage of a capital trial. Indeed, trial counsel's halting approach to punishment was worse than if they stayed silent. Trial counsel gave the jury the impression that the limited cross-examination they bothered to undertake was the best punishment case Mr. Shore could make, and they put an exclamation point by expressing their personal agreement with the State's case. They flicked the switch, turning off the jury's ability to care about their client's case and his right to life over death.

> **3.     Mr. Shore's instructions to trial counsel regarding how to conduct the punishment phase of his trial does not excuse counsel's deficient performance.**

Far from excusing Mr. Shore's trial counsel's deficient mitigation investigation, Mr. Shore's instructions to trial counsel to ask the jury to sentence him to death highlight the harm done by counsel's shoddy work. First off, Mr. Shore's directive apparently did not come until the eve of trial or during the trial itself. Indeed, Ms. Vitale's notes indicate Mr. Shore was still trying desperately to work out a deal to save his life a mere few months before trial, so he had not accepted death at that late date. Exhibit 2. Ms. Vitale also commented on the late timing of

Mr. Shore's change of heart in one of her invoices dated October 31, 2004, a few days after Mr. Shore's trial had ended: "Judge Cosper is going to have a stroke! [Mr. Shore] should have decided not to mount a defense long before and it would have saved everyone a lot of time and money.  Oh well, until next time . . . ."  Exhibit 1.  This timing is critical because it establishes that trial counsel cannot claim that Mr. Shore's instructions are the reason for their lack of a competent mitigation investigation, not that Mr. Shore's instructions would be a valid excuse anyway.[8]  The timing further demonstrates that Mr. Shore made his fateful choice to ask his counsel to request that the jury sentence him to death against the backdrop of the meager results of his trial counsel's pitiful mitigation investigation.  Mr. Shore really had no choice at that point.  He had no case to present because his counsel had failed him.  Had trial counsel done their jobs to save Mr. Shore's life, Mr. Shore would have had a real strategic choice at the

---

[8] It is firmly established that Mr. Shore's trial counsel owes a duty to conduct a thorough mitigation investigation even if the client wished otherwise.  Counsel's duty to use his or her team to conduct a thorough sentencing phase investigation is well established:

> The duty to investigate exists regardless of the expressed desires of a client.  Nor may counsel "sit idly by, thinking that investigation would be futile."  Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case.

ABA Guideline 10.7 comment, at 1021; SBOT Guideline 11.1(A), at 971 ("Counsel at every stage have an obligation to conduct a thorough and independent investigations relating to the issues of both guilty and penalty."); *see also Rompilla v. Beard*, 545 U.S. 374, 387-90 (2005); *Hamblin v. Mitchell*, 354 F.3d 482, 485-88 (6th Cir. 2003) (quoting ABA Guideline 10.7 comment as creating the required standards of performance for counsel in capital cases regarding the investigation of mitigating circumstances); *Dickerson v. Bagley*, 453 F.3d 690, 694 (6th Cir. 2006) (same); ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), 93 (1989) (investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor").

punishment phase, and he would have been able to seek to save his own life, as he had so desperately been trying to do a mere few weeks before.

Similarly, Mr. Shore's instructions also do not excuse trial counsel's other errors during the punishment phase. Trial counsel certainly cannot blame their embrace of the State's case on Mr. Shore's instructions because those instructions were the result of trial counsel's ineffective mitigation investigation. Further, Mr. Shore's instructions did not touch on trial counsel's ability to present mitigation evidence or cross-examine witnesses, 21 RR 23-26; 24 RR 113-14, and thus trial counsel cannot blame their client for their deficiencies in these areas.

> **D.** **Mr. Shore need not show prejudice—or alternatively, Mr. Shore suffered prejudice—as a result of his trial counsel's deficient performance.**

Mr. Shore need not prove prejudice because his trial counsel's failure to participate in the trial's punishment phase was per se prejudicial. Alternatively, if trial counsel's conduct was not per se prejudicial, Mr. Shore is able to show that such conduct caused him prejudice. In either instance, Mr. Shore's sentence of death is unconstitutional.

> **1.** **Mr. Shore suffered *per se* prejudice by the constructive deprivation of counsel.**

As the United States Supreme Court explains in *Chapman v. California*, some failings by counsel can never amount merely to non-prejudicial or harmless error. Rather, "[i]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that make the adversary process itself presumptively unreliable." *United States v. Cronic*, 466 U.S. 648, 659 (1984). When such a failing in the adversarial process occurs, "constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." *Strickland*, 466 U.S. at 692. Put succinctly, where counsel is absent or constructively absent, counsel has rendered ineffective assistance that is per se prejudicial; actual prejudice need not be shown. *Id.*

By essentially recusing themselves from the punishment phase of Mr. Shore's trial and turning their back on their duty to conduct a reasonable and thorough mitigation investigation, Mr. Shore's trial counsel were constructively absent from the proceedings and therefore rendered ineffective assistance that was per se prejudicial.  *See id*.  "Assistance of counsel" requires participation in the proceeding, and counsel's performance has been adjudged ineffective and per se prejudicial where counsel has failed to participate.  *See*, *e.g.*, *Tucker v. Day*, 969 F.2d 155, 159 (5th Cir. 1992) (finding prejudice where defense counsel merely "stood in" during defendant's sentencing).[9]  Mr. Shore's trial counsel likewise simply stood aside during the punishment phase, foiling the adversarial process and resulting in ineffective assistance that is per se prejudicial. *See id*.

### 2.    Alternatively, Mr. Shore suffered actual prejudice as the result of trial counsel's deficient representation.

Even if Mr. Shore's trial representation was not per se prejudicial, it nonetheless caused actual prejudice and was therefore constitutionally deficient.  Actual prejudice results when the totality of the mitigating evidence "might well have influenced the jury's appraisal" of the defendant's "moral culpability."  *Rompilla*, 545 U.S. at 393; *Wiggins*, 539 U.S. at 538; *Williams*, 529 U.S. at 398.  The operative question is whether there is a reasonable probability "that at least one juror" would have voted differently at the sentencing phase of the criminal trial.  *Wiggins*, 539 U.S. at 537.  When assessing prejudice from counsel's errors or omissions, reviewing courts must look at all of the mitigating evidence in the aggregate, including the evidence adduced at trial and the evidence adduced in the post-conviction proceedings. *Wiggins*, 539 U.S. at 536;

---

[9] *See also Harding v. Davis*, 878 F.2d 1341, 1345 (11th Cir. 1989); *Martin v. Rose*, 744 F.2d 1245, 1250-51 (6th Cir. 1984); *Reyes-Vasquez v. United States*, 865 F. Supp. 1539, 1548 (S.D. Fla. 1994); *Gardiner v. United States*, 679 F. Supp. 1143, 1147 (D. Maine 1988) (holding that actual prejudice was presumed when trial counsel failed to aid defendant in any manner with respect to sentencing).

*Williams*, 529 U.S. at 397-98.   Prejudice occurs even if the omitted evidence "does not undermine or rebut the prosecution's death-eligibility case." *Williams*, 529 U.S. at 398.

Courts must look at all consequences that would have flown from competent legal performance, including the impact of undiscovered mitigating evidence on the work of expert witnesses. *Rompilla*, 545 U.S. at 392-93.   Here, the most obvious prejudicial action of trial counsel was essentially adopting the State's position at the punishment stage and asking the jury to sentence their client to death.   Beyond that gross deviation from the standards of capital defense counsel, there are also other bases for finding prejudice.   Had trial counsel conducted a reasonable mitigation investigation they would have discovered useful mitigation evidence.   For example, Mr. Shore's father would have contested much of Regina Shore-Belt's damaging testimony, including her version of the kitten and screwdriver incidents.   *See* Exhibit 4; 21 RR 38-39.   More mitigation evidence may have been forthcoming in the area of Mr. Shore's mental health, a topic that federal habeas counsel is continuing to investigate.   Trial counsel could have also made excellent mitigation points by documenting Mr. Shore's positive experiences with therapy.   Further, trial counsel's active cross-examination of the State's witnesses, including Regina Shore-Belt, would have exposed the flaws in the State's punishment case.   *See* 21 RR 38-39, 54-56.   And trial counsel could and should have objected to much of the State's punishment evidence, including two unfairly prejudicial photographs of Ms. Lesher.   *See* State's Exhibits 107-08; 21 RR 240-42.

But the most damaging prejudice to Mr. Shore did not come as a result of any particular failure of trial counsel.   It was the sum of them all—the utter abdication that occurred in the punishment phase of the trial.   The one-sided view presented at punishment was a powerful one, and it likely influenced the jury because it created an aura of inevitably about Mr. Shore's fate.

Even a meager defense would have shattered this illusion of inevitably and agreement, but trial counsel did not do even that much.   Instead, Mr. Shore's trial counsel betrayed their client in the worst possible way by expressing their agreement with the State's case to the jury.   Equally prejudicial to Mr. Shore was trial counsels' decision to pursue an unfocused and grossly incomplete strategy during the punishment phase.   Their haphazard and arbitrary questioning of the State's witnesses gave the impression that a vigorous defense was being mounted when in reality nothing could be further from the truth.   In short, trial counsels' ineptitude and unprofessionalism sealed Mr. Shore's fate before the jury ever retired to their deliberations.

Additionally, the Supreme Court's holding in *Schriro v. Landrigan* does not impede Mr. Shore's ability to show prejudice. *Schriro v. Landrigan*, 550 U.S. 465. (2007). The Court held in *Landrigan* that "it was not objectively unreasonable for [a state] court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice." *Id.* at 478.   The *Landrigan* decision does not prevent Mr. Shore from establishing prejudice because Mr. Shore did not make an unequivocal and informed refusal of mitigation evidence of the type seen in *Landrigan*. Indeed, the Fifth Circuit has suggested *Landrigan* should not control where a petitioner's habeas record is factually distinct from the *Landrigan* record. *Clark v. Thaler*, 673 F.3d 410, 422 (5th Cir. 2012) ("Here, no court below passed on whether any waiver by [Petitioner] was informed and knowing, and the record is more ambiguous than the record in *Landrigan*. Accordingly, we assume, without deciding, that *Landrigan* does not control.").

The *Landrigan* Court found that Landrigan, the petitioner, would have refused to allow trial counsel to present any mitigation evidence that his trial counsel might have uncovered. *Landrigan*, 550 U.S. at 476-77. In support of this finding, the Court noted a colloquy between

Landrigan and the trial judge confirming Landrigan's knowing refusal to allow counsel to present mitigation evidence on his behalf. *Id.* at 567, 476-77. The Court also pointed to Landrigan's repeated interruptions of his trial counsel's attempts to advocate for his life as a critical factor in that case. *Id.* In contrast, there is no record of Mr. Shore directing his attorneys not to present mitigation evidence, and Mr. Shore allowed his trial counsel to raise multiple objections to some of the State's punishment witnesses. Indeed, it is this very halting defense by trial counsel that was so prejudicial to Mr. Shore, because it gave the impression that that was the best trial counsel could do.

Mr. Shore's case also differs from *Landrigan* because the *Landrigan* Court found that the mitigation evidence offered in his federal habeas petition was known to Landrigan and available to him at trial. *Id.* But in Mr. Shore's case, trial counsel's failure to properly investigate prevented Mr. Shore from knowing at the time of trial about the mitigation evidence he now asks this court to consider, such as testimony of his father and the pending investigation of his mental health. Any refusal or waiver by Mr. Shore was therefore unknowing and distinct from the record in *Landrigan*. For these reasons the *Landrigan* decision does not prevent Mr. Shore from establishing prejudice.

**E.      Section 2254(d) poses no bar to granting relief on Mr. Shore's ineffective assistance of counsel claim.**

In state habeas proceedings, Mr. Shore was denied relief on his claim that counsel was ineffective for failing to adequately conduct a mitigation investigation and to effectively contest the State's punishment case. *Ex parte Shore*, No. WR-78,133-01, 2013 WL 173017 (Tex. Crim. App. Jan. 16, 2013); *see also* State Habeas Petition at 20-22; 23-53.  The state court's decision (1) was contrary to clearly-established federal law and (2) resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented to the state court. 28 U.S.C. § 2254(d).

### III.    The Trial Court's Failure To Obtain A Valid Waiver Deprived Mr. Shore Of His Constitutional Right To Contest The Punishment Phase Of His Trial.

#### A.    The trial court's failure to ensure that Mr. Shore made a valid waiver deprived him of his constitutional right to contest the punishment phase of his trial.

The Supreme Court has recognized a death penalty defendant's clearly established Constitutional right to present mitigation evidence and to have the sentencing jury consider mitigation evidence. *Abdul–Kabir v. Quarterman*, 550 U.S. 233, 127 (2007); *Brewer v. Quarterman*, 550 U.S. 286 (2007); *Ring v. Arizona*, 536 U.S. 584 (2002); *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Lockett v. Ohio*, 438 U.S. 586 (1978). The requirement of informed and knowing waiver of such trial rights is firmly established. *Brookhart v. Janis*, 384 U.S. 1 (1966) (right to confrontation); *Adams v. United States ex rel. McCann*, 317 U.S. 269 (1942) (right to jury trial); *Barker v. Wingo*, 407 U.S. 514 (1972) (right to speedy trial); *Green v. United States*, 355 U.S. 184 (1957) (right to be free from double jeopardy). The record in Mr. Shore's case is devoid of statements constituting a valid waiver of his constitutional right to present and have the jury consider mitigation evidence. 21 RR 23-24; 24 RR 113-14.

#### B.    Section 2254(d) poses no bar to granting relief on Mr. Shore's waiver claim.

In the state habeas proceedings, Mr. Shore was denied relief on his waiver claim. *Ex parte Shore*, No. WR-78,133-01, 2013 WL 173017 (Tex. Crim. App. Jan. 16, 2013); *see also* State Habeas Petition at 20-21; 23-30. The state court's decision (1) was contrary to clearly-established federal law and (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state court. 28 U.S.C. § 2254(d).

Specifically, the state post-conviction court's conclusion that Mr. Shore validly waived his right to contest the punishment phase of his trial involved an unreasonable application of clearly established federal law as determined by the Supreme Court.  The Supreme Court's decision in *Schriro v. Landrigan* is not contrary to this conclusion because the *Landrigan* Court considered only a claim of ineffective assistance of counsel, as opposed to a claim based on denial of the right to present and have the jury consider a punishment case. *Landrigan*, 550 U.S. at 468.  *Landrigan* therefore did not change the clearly established requirement under federal law that waiver of constitutional trial rights must be informed and knowing.

*Landrigan* is distinguishable in other ways as well.  In *Landrigan*, the Court gave three reasons the petitioner could not benefit from the requirement that a waiver of the presentation of mitigation evidence must be informed and knowing if such a requirement did exist. *Id.* at 479-80. However, none of these three reasons prevents Mr. Shore from benefitting from of an informed and knowing waiver standard.  The first reason given by the Court for Landrigan's inability to benefit from the waiver standard was Landrigan's failure to present the argument in his state post-conviction proceedings. *Id.* at 479. In contrast, Mr. Shore has properly preserved this argument. State Habeas Petition at 20-21, 47-70. The second reason the Court gave for Landrigan's inability to benefit from the argument was Landrigan's well-documented insistence that trial counsel not present mitigation evidence. *Landrigan*, 550 U.S. at 479. However, the record on Mr. Shore's alleged waiver of mitigation evidence is not nearly as developed as the purported waiver in *Landrigan*. 21 RR 23-24; 24 RR 113-14. The final reason the Court gave for Landrigan being unable to benefit from the waiver standard was Landrigan's statement to the trial court: "I think if you want to give me the death penalty, just bring it right on. I'm ready for it." *Id.* at 479-80. The *Landrigan* Court interpreted this statement as evidence that Landrigan

clearly understood the consequences of telling the sentencing judge there were no mitigating circumstances of which the sentencing court should be aware.  *Id.* at 480.  In contrast, there is no similarly explicit statement from Mr. Shore that illustrates Mr. Shore's understanding of the severe consequences of waiving mitigation evidence in a death penalty prosecution.

Each of the three reasons given by the *Landrigan* Court for not applying an informed and knowing requirement to waiver of mitigation evidence does not apply in Mr. Shore's case. Therefore, Mr. Shore should benefit from the requirement that a death penalty defendant's waiver of mitigation evidence must be informed and knowing.  Indeed, this is a restatement of the Court's longstanding requirement that waiver of any Constitutional trial right must be informed and knowing.  *Brookhart v. Janis*, 384 U.S. 1 (1966) (right to confrontation); *Adams v. United States ex rel. McCann*, 317 U.S. 269 (1942) (right to jury trial); *Barker v. Wingo*, 407 U.S. 514 (1972) (right to speedy trial); *Green v. United States*, 355 U.S. 184 (1957) (right to be free from double jeopardy). Therefore, the state post-conviction court's conclusion that Mr. Shore validly waived his constitutional right to present and have a jury consider mitigating evidence "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

**IV.    Mr. Shore's Conviction And Death Sentence Are Also Unconstitutional Because His Counsel Was Ineffective During The Guilt-Innocence Phase Of His Trial, His Statement Was Involuntary And Violated *Miranda*, And The State Failed To Turn Over All Exculpatory And Mitigating Evidence.**

Mr. Shore's conviction and death sentence are also unconstitutional for a number of other reasons.  Mr. Shore's trial counsel was constitutionally ineffective during the guilt-innocence phase of his proceedings, which prejudiced Mr. Shore.  Also, Mr. Shore's statement was involuntary, and law enforcement violated *Miranda v. Arizona*, 384 U.S. 436 (1966), in

procuring it.  Finally, the State failed to turn over all exculpatory and mitigating evidence to Mr.

Shore, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Undersigned counsel is still

investigating the factual bases of these claims and intends to amend this petition with additional

details on their exact parameters.

**V.      All Of The Foregoing Arguments Are Preserved Or Are Otherwise Available.**

> **A.      Mr. Shore raised his ineffective assistance of counsel and waiver of the right to contest the punishment phase of his trial claims in his state habeas petition.**

Mr. Shore raised his ineffective assistance of counsel and waiver of the right to contest

the punishment phase of his trial in his state habeas petition, these claims are thus preserved for

review at this juncture.  State Habeas Petition at 19-22, 47-70.

> **B.      To the extent the Court considers any of Mr. Shore's claims to be waived, any such failure to raise them earlier is excused.**

If the Court determines that Mr. Shore did not satisfy the preservation requirements for

any of his arguments—such as for his claim that he is ineligible for the death penalty because he

is severely mentally ill or suffers from brain defects—then this failure to raise the claims earlier

is excused.  The primary reason for this is that these are the types of claims that could only

effectively be raised on habeas review, and state habeas counsel was ineffective if he failed to

investigate or raise these meritorious claims.  Here state habeas counsel did basically nothing to

investigate Mr. Shore's case or effectively advocate on his behalf, and thus Mr. Shore is excused

from his failure to raise any these claims on state habeas review.

The legal basis for this excuse is ensconced in United States Supreme Court precedent.

*Coleman v. Thompson*, 501 U.S. 722 (1991), laid the initial groundwork, recognizing that

procedural default can be overcome in some circumstances:

> In all cases in which a state prisoner has defaulted on his federal claim in state
> court pursuant to an independent and adequate state procedural rule, federal

40

> habeas review of the claims is barred unless the prisoner can demonstrate cause
> for the default and actual prejudice as a result of the alleged violation of federal
> law or demonstrate the failure to consider the claims will result in a fundamental
> miscarriage of justice.

*Coleman*, 501 U.S. at 750.  The Court further held that ineffective assistance of counsel was

sufficient cause to excuse procedural default, but the Court also held that the petitioner in that

case had no constitutional right to counsel in the state habeas proceedings.  *Id.* at 755-57

("Because Coleman had no right to counsel to pursue his appeal in state habeas, any attorney

error that led to the default of Coleman's claims in state court cannot constitute cause to excuse

the default in federal habeas.").

The Supreme Court later carved out an exception to *Coleman* to cover certain state

habeas claims in *Martinez v. Ryan* 132 S.Ct. 1309 (2012).  Specifically, the Court in *Martinez*

held that in certain circumstances then the petitioner has a right to effective assistance of state

habeas counsel in raising a claim of ineffective assistance of trial counsel: "Inadequate assistance

of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural

default of a claim of ineffective assistance at trial."  *Id.* at 1315.  The Court reasoned that when

the petitioner's first opportunity to allege ineffective assistance of trial counsel comes at the state

habeas proceeding, then the petitioner has a right to effective state habeas counsel at least for that

claim because it is effectively the equivalent of a direct appeal for purposes of the constitutional

right to counsel.  *Id.* at 1317.  To sum up, the Court held the following:

> [W]hen a State requires a prisoner to raise an ineffective-assistance-of-trial-
> counsel claim in a collateral proceeding, a prisoner may establish cause for a
> default of an ineffective-assistance claim in two circumstances.  The first is where
> the state courts did not appoint counsel in the initial-review collateral proceeding
> for a claim of ineffective assistance at trial.  The second is where appointed
> counsel in the initial-review collateral proceeding, where the claim should have
> been raised, was ineffective under the standards of *Strickland v. Washington*, 466
> U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To overcome the default, a
> prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-

41

counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.

*Id.* at 1318.

The Supreme Court later extended *Martinez*'s holding—that ineffective assistance of counsel at "initial-review collateral proceedings" may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial—to jurisdictions like Texas which effectively, but not expressly, require ineffective assistance of trial counsel claims to be raised at the habeas stage.  *Trevino v. Thaler*, 133 S.Ct. 1911 (2013).  While, Texas's procedural rules do not explicitly reserve claims for ineffective assistance of trial counsel for state collateral review, the Court noted that Texas's procedure "makes it virtually impossible for appellate counsel to adequately present an ineffective assistance of trial counsel claim on direct review."  *Id.* at 1918 (quoting *Robinson v. State*, 16 S.W.3d 808, 811 (Tex. Crim. App. 2000) (internal quotation marks omitted).  "Texas courts in effect have directed defendants to raise claims of ineffective assistance of trial counsel on collateral, rather than on direct, review."  *Id.* at 1919.  The Court thus extended its *Martinez* holding and held that "where . . . [a] state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, our holding in *Martinez* applies."  *Id.* at 1919.

The *Trevino-Martinez* exception applies here because the state habeas proceeding was the first point at which Mr. Shore could have effectively raised his ineffective assistance of counsel claim and his claim that his death sentence violates the Eighth and Fourteenth Amendments because he is severely mentally ill or suffers from certain brain defects.  Both of these claims require factual investigation and the presentation of new evidence, and thus Mr. Shore could not effectively raise them on direct appeal.  Because the *Trevino-Martinez* exception applies, any

procedural default due to state habeas counsel's failure to pursue and raise these claims is excused if the claims have merit.  That is the result demanded by *Trevino* and *Martinez*, as Mr. Shore's state habeas counsel failed to provide Mr. Shore constitutionally effective assistance of counsel by neglecting to pursue and raise these meritorious claims.  Further, this result is especially appropriate here, given the paucity of Mr. Laird's investigation and his track record of obstructing Mr. Shore's ability to obtain federal habeas review.

### C.   The miscarriage of justice exception excuses any alleged procedural default of Mr. Shore's claim that his death sentence violates the Eighth and Fourteenth Amendments because he is severely mentally ill or suffers from certain brain defects.

Additionally, the miscarriage of justice exception further excuses any alleged procedural default of Mr. Shore's claim that his death sentence violates the Eighth and Fourteenth Amendments because he is severely mentally ill or suffers from certain brain defects.  *See Sawyer v. Whitley*, 505 U.S. 333 (1992).  Any alleged procedural default of Mr. Shore's mental illness claim can be excused because failure to do so would result in a miscarriage of justice.  The fundamental miscarriage of justice exception encompasses not only a petitioner who is actually innocent of the crime, but also one who is actually innocent of the death penalty. *Sawyer*, 505 U.S. at 347.  The Supreme Court has held that "innocence of the death penalty" should focus on the objective elements "that render a defendant eligible for the death penalty." *Id.* To show actual innocence of the death penalty, one must show by clear and convincing evidence that, but for the constitutional violation, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.  *Id.* at 336.

Mental retardation is an element that renders a person ineligible for the death penalty and, should a petitioner be able to prove it, excuses procedural default:  "It is self-evident that, if

[a] petitioner can, with the appropriate assistance [by the federal] Court, establish he is, in fact, mentally retarded, [then] application of the fundamental miscarriage of justice exception to the federal doctrine of procedural default means the Supreme Court's holding in *Atkins* effectively trumps any *procedural* dismissal of petitioner's most recent state habeas corpus proceeding." Order Lifting Stay and Granting Investigative Assistance, *Sells v. Quarterman*, 2008 U.S. Dist. LEXIS 78172 at *5-6, No. SA-08-CA-00465-OG (W.D. Tex. Aug. 4, 2008) (emphasis in original); *see also Bowling v. Commonwealth*, 163 S.W.3d 361, 372-73 (Ky. 2005) (if petitioner can prove that he is mentally retarded, he would be actually innocent of the death penalty and the miscarriage of justice exception to procedural default would apply).

As discussed above, the rationale of the Court's acceptance in *Atkins* that mentally retarded murderers are so lacking in moral blameworthiness as to be ineligible for the death penalty dictates that the severely mentally ill should likewise be ineligible.  Indeed, the similarly between the two arguments is striking.  The miscarriage of justice of exception, therefore, should apply to this analogous claim as well.

## <u>CONCLUSION AND PRAYER</u>

WHEREFORE, Mr. Shore prays that this Court:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be relieved of his unconstitutional sentence of death;

2. If necessary to resolve disputed factual issues, schedule an evidentiary hearing during which Mr. Shore may present evidence in support of his claims; and

3. Grant such other relief as law and justice require.

Respectfully submitted,


By:   */s/ Marcy E. Kurtz*_____

Marcy E. Kurtz
Federal I.D. No. 5381
State Bar No. 11768600
marcy.kurtz@bgllp.com
K. Knox "Lighthorse" Nunnally
Federal ID No. 1419997
State Bar No. 24063995
J. Mark Little
Federal ID No. 1487508
State Bar No. 24078869
Ryan C. Myers
State Bar No. 24088110
J. Eric Holland
State Bar No. 24086285
Bracewell & Giuliani LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
Telephone: 713.223.2300
Facsimile: 713.221.1212

**Attorneys for Petitioner Anthony Shore**

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th of January, 2014, I electronically filed the foregoing pleading with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court.  A copy of this foregoing pleading was sent to Woodson Erich Dryden, attorney of record for Respondent William Stephens, at his email address: erich.dryden@oag.state.tx.us.


*/s/ Marcy E. Kurtz*_____
Marcy E. Kurtz