United States District Court
Southern District of Texas
**ENTERED**
February 19, 2016
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

ANTHONY SHORE,          §
        Petitioner,      §
                   §
v.                     §      CIVIL ACTION NO.  H-13-1898
                   §
WILLIAM STEPHENS,      §
Director, Texas Department of     §
Criminal Justice, Correctional     §
Institutions Division,         §
        Respondent.     §

## MEMORANDUM OPINION AND ORDER

In 2004, the State of Texas tried Shore for the capital murder of Maria Del Carmen Estrada.  In a separate punishment phase after his conviction, the State introduced extensive evidence of Shore's numerous other crimes, including additional murders and various sexual offenses.  The defense did not present any evidence.  The jury answered Texas' special issue questions in a manner requiring the imposition of a death sentence.  Shore unsuccessfully availed himself of Texas appellate and habeas remedies, raising several challenges to his conviction and sentence.

On January 16, 2014, Shore filed a federal petition for a writ of habeas corpus.  Doc. # 20.  Shore raises three claims in his federal petition.  Shore's federal claims focus on the integrity of his waiver of a punishment defense and on the possibility that he has experienced organic brain damage.  After a court-authorized brain scan, Shore amended his petition.  Doc. # 39.  Respondent William Stephens has moved for summary judgment, Doc. # 42, and Shore has filed a reply, Doc. # 44.

Having reviewed the record, pleadings and the law, and giving careful consideration to the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the Court concludes that Shore is not entitled to federal habeas relief.  The Court, therefore, will grant Respondent's motion for summary judgment, deny Shore's petition, and dismiss this case.  The Court will not certify any issue for consideration by the Court of Appeals of the Fifth Circuit.

I.      **BACKGROUND**

   A.      **The Crime and Shore's Confession**

In 1995, law enforcement officers from several agencies formed a special task force to investigate the murders of three females: twenty-one-year-old Maria Del Carmen Estrada in April 1992, nine-year-old Diana Rebollar in August 1994, and sixteen-year-old Dana Sanchez in July 1995. Tr. Vol. 21 at 138. Similarities between the victims and their killings suggested one perpetrator: "All three of these victims had been strangled. They had all been strangled with the same peculiar tourniquet style ligature. They were all Hispanic. They were all small girls. They were all young ages 9 to 21. They all had long hair. They were all last seen walking alone and they were taken from the same basic geographic area." Tr. Vol. 21 at 138.

The task force held a press conference in September in 1995 and asked the public for information. The police received hundreds of tips, but they did not develop into any concrete leads. The task force ultimately disbanded without making an arrest.

In 2003, police officers had DNA testing performed on additional evidence. By that point in time, Shore had been arrested for two counts of indecency with a child. As a result, a database contained Shore's DNA profile. Shore's DNA matched evidence connected to two of the murders investigated by the task force. The police arrested Shore on October 24, 2003.

The police interrogated Shore about Ms. Estrada's murder for several hours. At the beginning of the interview, Shore waived his legal rights, including his right to remain silent, his right to an attorney, and his right to terminate the interview. Eventually, the police officers also began questioning Shore about the murders of Ms. Rebollar and Ms. Sanchez. According to one police officer, Shore was "very cooperative and spoke freely, very matter of factually [sic]." Tr. Vol. 15 at 14.[1]

---

[1]      The state court proceedings in this case resulted in a voluminous record. The Court will cite the Clerk's Record containing trial court motions and docket entries as Clerk's Record at ___. The reporter's record containing the trial court proceedings will be cited as

(continued...)

Shore initially did not admit to any knowledge of the murders but eventually agreed to speak "hypothetically" about what had happened.  Tr. Vol. 15 at 21.  Shore told police officers, "What would you say if I gave you these cases and a couple of bonuses?"  Tr. Vol. 15 at 46.  Shore then confided: "Well, I have this evilness in me, and I think if I tell you what I've done that it will release that evilness, and I would feel better."  Tr. Vol. 15 at 46.  Shore then described how he had committed the three murders investigated by the special task force.  In addition to those other murders, Shore admitted that he had raped and killed fourteen-year-old Laurie Tremblay in 1986.  Shore subsequently gave tape-recorded statements describing the crimes.[2]

On direct appeal, the Texas Court of Criminal Appeals summarized Shore's confession as follows:

> On September 26, 1986, [Shore] murdered fourteen-year-old Laurie Tremblay while attempting to sexually assault her.  In discussing this crime, [Shore] stated that he was preoccupied with young girls and that he had met Tremblay by giving her rides on a semi-regular basis.  During one of these rides, [Shore], then twenty-four years old, became sexually aggressive and unhooked the fourteen-year-old's bra.  She demanded that [Shore] stop, and the two argued.  [Shore] hit Tremblay in the back of the head and then used a cotton cord to strangle her.  According to [Shore], the cord kept breaking, and he injured his finger while tightening the ligature; "I tried to make sure that she would never, ever tell anybody."  The strangulation left a knuckle impression on the back of Tremblay's neck, and the cord itself left two distinct pressure lines.  [Shore] dumped the victim's body behind a restaurant.  The crime remained unsolved until 2003.

On April 16, 1992, [Shore], at twenty-nine years old, gave a ride to

---

[1]      (...continued)

Tr. Vol. ___ at ___.  The Court will refer to the record from Shore's state habeas proceedings as S.H.R. at ___.

[2]      After a hearing, the trial court denied Shore's pre-trial motion to suppress his confessions.  Tr. Vol. 15 at 79.  In addition to the police officer testimony at trial, the State demonstrated the voluntariness of Shore's confession by introducing into evidence a letter that he wrote a former neighbor.  Shore wrote on December 4, 2003, that, "after 13 hours of intense interrogation I decided to do the right thing and voluntarily told them all . . .  I am going to face the fire . . .  Whatever happens to me so that the victims' families and friends may find some closure."  Tr. Vol. 26, State's Exhibit 220.

twenty-year-old Maria Del Carmen Estrada, the victim in this capital-murder prosecution. Recounting the event, [Shore] stated that she "freaked out" when he made sexual advances toward her, but he persisted in his attack, using a pair of shears to aid in his attempt to rape her. He ultimately strangled Estrada by twisting a nylon cord around her neck and tightening it with a piece of wood. As in his first murder, [Shore] dumped the victim's body behind a restaurant and left. When Estrada's body was found, signs of trauma were apparent on her face. Her pants had been removed, her underpants and hose had been pulled below her pubic area, her shirt was open, her bra had been cut, and her hose appeared to be cut in the crotch. An examination revealed that Estrada's vagina had a bloody contusion deep inside. The crime remained unsolved until 2003.

About a year and a half later, at thirty-one, [Shore] became infatuated with a fourteen-year-old student who was often home alone after school. On October 19, 1993, she came home to find [Shore] waiting for her. He was wearing baggy clothes, surgical gloves, sunglasses, and a bandana over his face. [Shore] bound the girl's hands with an electrical cord and wrapped her head in duct tape. He took her into the bedroom, took off her pants, and cut her panties off with a knife; [Shore] then raped the girl as she screamed and cried. He then began choking her, but she managed to escape. Before fleeing the home, [Shore] threatened that he would return and kill her and her family if she reported the crime. He also told her that he had been watching her and named her school and sports activities. A sexual-assault examination revealed that the victim's hymen and anus were torn, and that semen was present. DNA recovered from that semen eventually pointed to [Shore] as its source. [Shore] admitted to this crime, saying that he had watched the girl during his work as a "telephone man." He admitted that he fantasized about her and wanted to rape but not murder her; this depraved desire, he believed, was proof that he could "beat the evilness" by possessing and controlling another human being without killing her. Again, the crime remained unsolved until 2003.

The next year, on August 7, 1994, [Shore], at thirty-two years old, abducted, raped or attempted to rape, and killed nine-year-old Diana Rebollar. He recounted that he saw the child walking down the street while he was driving a van. He pulled into a parking lot and began talking to her. Noticing that nobody else was around, [Shore] grabbed Rebollar, threw her into the van, duct taped her hands and feet, drove behind a building, then attacked her. Her body was later found on the loading dock of a building, naked except for her black t-shirt, which had been pulled up to her armpits, and her vagina and anus were bloody. [Shore] admitted to killing her by strangulation; a rope with a bamboo stick attached to it was found around Rebollar's neck. This crime also remained unsolved until 2003.

On, or soon after, July 6, 1995, [Shore] saw sixteen-year-old Dana Sanchez at a pay phone; [Shore] was thirty-three.  [Shore] stated that Sanchez appeared angry, and he offered her a ride.  Sanchez accepted the ride, but soon objected when [Shore] began touching her.  She tried to evade him, but he pulled her into the back of the van and restrained her after she bit his chest.  He then removed her clothes. [Shore] claimed that he did not sexually assault Sanchez, but admitted that he did kill her.  Sanchez's decomposed body was found after [Shore] made an anonymous call to a television news station reporting that there was a "serial killer out there" and giving the body's location and a detailed description of the victim.  The nude body was found with a yellow rope wrapped around its neck; a toothbrush was twisted in the ligature with a knot.  Like the other murders, this crime remained unsolved until 2003.

*Shore v. State*, No. AP-75,049, 2007 WL 4375939, at *1 (Tex. Crim. App. Dec. 12, 2007)

The State of Texas charged Shore with four murders, including capital murder for intentionally killing Ms. Estrada in the course of committing or attempting to commit aggravated sexual assault or kidnapping.  Shore was tried in the 339th District Court of Harris County, Texas with the Honorable Judge Caprice Cosper presiding.  The trial court appointed Alvin Nunnery and Gerald E. Bourque to represent Shore.  Attorney Patrick F. McCann also agreed to assist the defense *pro bono*.

The record before the Court does not provide full insight into the defense's pretrial investigation.  Trial counsel requested and secured funding for an investigator nearly a year before trial.  Clerk's Record ("C.R.") at 12-22.  The defense specifically tasked investigator Gina Vitale with discovering mitigating evidence.  S.H.R. at 12-22.  Ms. Vitale's billing records indicate that she interviewed witnesses, but the record does not divulge the extent of her investigation into Shore's background.  However, Ms. Vitale produced a lengthy document titled "Tony Shore Life History" containing a broad overview of his life. Doc. # 39, Exhibit 5.  Additionally, the record shows that Ms. Vitale obtained a manuscript of Shore's life story that he had written in jail.  Tr. Vol. 21 at 49.  Shore himself also provided trial counsel mitigating evidence including information about his background.  State Habeas Record ("S.H.R.") at 165.

Five months before trial the defense requested additional funding for an expert to

5

analyze Shore's mental and physical condition.  S.H.R. at 208-12.  The record does not contain the results of any mental examination.

      **B.**     <u>**The Trial**</u>

Shore had been charged with capital murder in the course of an aggravated sexual assault, a kidnapping, or the attempted commission of either crime.  The prosecution presented the jury with detailed forensic evidence and witness testimony tying Shore to Ms. Estrada's murder.  The lynchpin of the case against Shore, however, was his detailed confession to the murder.

With Shore's voluntary confession, the defense faced an onerous task in the guilt/innocence phase.  The defense moved for the trial court to instruct the jury on lesser-included offenses.  Closing arguments clarified the defense's strategy.  The defense admitted that Shore had killed Ms. Estrada.  The defense also conceded that he had engaged in sexual relations with her against her will.  The defense, however, pleaded with jurors to find Shore guilty only of a lesser offense because the evidence did not show that he had committed aggravated sexual assault or kidnapping.  Trial counsel told jurors that Shore "intended to kill her.  He killed her.  It's disgusting.  It's depraved.  It's maniacal, but it ain't capital murder."  Tr. Vol. 20 at 24-25.  With that predicate, the defense urged jurors to find Shore guilty of only simple murder.

Jurors found Shore guilty of capital murder.  Under Texas law, jurors would decide Shore's fate after the presentation of argument and evidence in a separate punishment phase. Ultimately, the jury decided Shore's fate by answering two special issue questions: (1) will the defendant be a future danger to society and (2) do sufficient circumstances mitigate against a death sentence?  *See* S.H.R. at 626-27; TEX. PENAL CODE art. 37.071 § 2(b).

During the trial, the State moved to adjudicate Shore's guilt with regard to his violation of deferred adjudication in two prior cases, both involving indecency with a child. Before the punishment phase began, the trial court held a plea colloquy on those motions. The prosecution and the defense had not made any agreement regarding the charges, but Shore still pleaded "true" to both motions.  Tr. Vol. 21 at 6.  The trial court engaged Shore in a discussion to determine whether his plea was voluntarily and knowingly made.  Tr. Vol.

21 at 6-9.  Trial counsel affirmed that Shore was competent, and the trial court accepted Shore's plea.  Tr. Vol. 21 at 8-9.

The prosecution's punishment-phase opening argument previewed the murders, sexual assaults, and other crimes that the jury would hear about for the next few days.  The defense then explained why they would not argue against a death sentence:

> Ladies and gentlemen, this is going to be very short. The Bible says that if you confess your sins, God said I'm faithful and just to forgive you and cleanse you of all unrighteousness.

> Something unusual happened yesterday and the evidence will show it, that when you returned your verdict of guilty in this case, Mr. Bourque and I may have been dissatisfied with the verdict.  Anthony was quite satisfied. Against our advice, against our better judgment, against our 40 years of experience, Anthony has asked on his behalf that we ask you to answer those [special-issue] questions in such a way that he's sentenced [to] death.

> Having done this as many years as I have, I found that a very, very, troubling thing but it is his life. It is where he is and it is what he thinks should happen to him based upon how he has lived his life.

> Throughout the course of a year, the evidence is going to show he has no explanation for why he is the way he is.  He has no explanation for what he has done.  In a twist of irony, when he was placed on probation in January of 1998, two good things happened.

> One, he was finally focused on.  The criminal justice system had finally caught up with him.  And then in October of 2003, he was finally stopped. Two good things happened.

> First and foremost, the citizens of Harris County were protected from him.  And secondly, he was protected from himself.

> Ms. Siegler talks about control and she talks about manipulation. It may well be, but I disagree that this is the final instance of manipulation or control.

> During the course of this period from the time he got placed on probation, he became – and he accepted a different lifestyle.  That is one where he accepted the Lord in his life, never with the courage to come forward, but with the realization that one day he was probably going to get caught.

And he told us – and the evidence will show – that he understood one thing about his conversion. While he would ultimately be free from the pain and penalty of sin, that is, eternal damnation, he has to pay the consequences of what he has done.

And he believes if the State believes and you, the citizens representing the State, believe that that ultimate penalty is death by lethal injection, then so be it.  He is prepared to give up his life in this instance for the things that he has done.  And he is prepared to do that, ladies and gentlemen, in spite of the fact that I submit to you that since placed on probation, things began to happen to help him to identify the things in his life that had gone wrong.  Things like, you know, drug use.  Things like how to address unusual sexual fantasies, et cetera.  All those things began to occur; but Anthony still believes that despite all of that, despite the fact that he's been able to sit in jail now for over a year and not violate the rules of the institution, it is time for him to sacrifice his life for what he has done.

As difficult as that is for me to tell you, that is where he is.  So throughout the course of this trial, unless there are legal matters that come up, Mr. Bourque and I are going to sit silent because we, too, agree that maybe the victims in this case need this forum to have their say.  But we are not going to unduly delay these procedures.

Thank you.

Tr. Vol. 21 at 23-26.  True to their statements, trial counsel did not argue for a life sentence.  Trial counsel did not present any evidence.  Trial counsel, however, did not sit silent throughout the entire punishment phase.  While Shore now disputes the depth to which they did so, trial counsel still engaged some witnesses in cross-examination and made legal and evidentiary objections.

The State called thirty-five witnesses in the punishment phase.  In particular, the State's punishment phase case relied on extensive evidence of Shore's murders, all involving victims who bore similar characteristics: "all young, small Hispanic girls who were last seen walking in the same geographic area and who were strangled with the same type ligature."  S.H.R. at 441. The State presented the jury with a cassette recording of Shore's confession to the other crimes.  The State verified Shore's confession to each of those murders with forensic evidence, including photographs of the young women's corpses.  The prosecution

additionally presented evidence of Shore's aggravated sexual assault of fourteen-year-old Joanna Lesher.

Jurors also heard from Shore's sister, Regina Shore Belt. Ms. Belt testified that Shore stabbed and killed a kitten when he was four or five years old. He also once pushed a screwdriver through Ms. Belt's head when they were children. Ms. Belt testified that between 1972 and 1977 Shore, who liked skinny girls with long hair, would make Ms. Belt knock on the doors of houses while he and Ms. Belt were riding bikes. When the young girls would come outside, Shore would grope and try to kiss the girls. When Shore married, Ms. Belt eventually reported to Child Protective Services that Shore acted inappropriately toward his daughters. Ms. Belt told jurors that it would be just for Shore to receive a death sentence. She also testified that Shore told her in letters that he "really believes that he should have the death penalty as that is what he wants." Tr. Vol. 21 at 50.

A former girlfriend testified that Shore would drug her and have sex with her against her will, doing so at least once with a friend. Another former girlfriend testified about how Shore used drugs, avoided his probation officer, and kept pornography of young girls. Along with those women, another girlfriend testified that Shore would grab their throats and strangle them during sex. Shore's two daughters testified that Shore would physically abuse them, inappropriately touch them, keep them locked-up in their house, drug them, tie them up, and masturbate in front of them. Shore's wife Amy Lynch testified about how Shore controlled her life. Shore would drug her and have sex with her while she was unconscious.

Sharon Burns, the clinical director of the sex offender program in which Shore participated from 1998 to 2003, explained that Shore had superior intellect and abstract reasoning ability. Testing, however, indicated that he had sexual deviations and could manipulate test results. Ms. Burns described Shore as grandiose, opportunistic, manipulative, and narcissistic. Although he was aware of what was socially acceptable, he would break a law if he thought he could get away with it. Ms. Shore explained that Shore's drugging and choking women while having sex simulated his crimes. Shore scored high on a scale that measured whether a person is a psychopath.

After the State had presented its evidence and witnesses, the trial court engaged

defense counsel in a brief discussion. Trial counsel reminded the trial court that he had "informed the jury at [opening arguments in the penalty phase] that it was [Shore's] position and his desire to tell them that he basically wanted them to answer the questions in such a way that the death penalty would result." Tr. Vol. 24 at 113. Trial counsel informed the trial court that additional discussion with Shore had not changed his mind. Tr. Vol. 24 at 114. Trial counsel stated that Shore had "made it quite clear . . . that he doesn't want [his attorneys] to in any way argue to the contrary to this jury." Tr. Vol. 24 at 114. When the trial court asked Shore, he described trial counsel's statement as "very accurate." Tr. Vol. 24 at 114. The defense rested without presenting any evidence. Tr. Vol. 24 at 122.

The prosecution's closing argument was a blistering recounting of Shore's crimes. Trial counsel did not deliver a closing argument. Before the jury, however, trial counsel stated that "at the request of Mr. Shore, but against the very strong advice of" his attorneys, the defense would waive punishment-phase arguments. Tr. Vol. 24 at 122.

The jury answered Texas' special issue questions in a manner requiring the imposition of a death sentence. S.H.R. at 626-27.

### C.    Shore's State Appellate and Habeas Challenges

Texas state law provides for automatic appeal to the Texas Court of Criminal Appeals. *See* TEX. CODE CRIM. PRO. § art. 37.071(h). Texas law also requires in capital cases that the trial court appoint counsel for appellate and habeas review soon after trial. *See* TEX. CODE CRIM. PRO. art. 26.052, § 3(j); TEX. CODE CRIM. PRO. art. 11.071, § 2. Immediately after sentencing Shore to death, the trial court observed that Shore had "expressed a potential interest in representing [himself] on both the Writ of Habeas Corpus and the automatic appeal." Tr. Vol. 24 at 146. The trial court reset the appointment of counsel on those issues "for a couple of weeks for [Shore] to think about that." Tr. Vol. 24 at 146.

Trial counsel moved to withdraw from the case. While the record does not contain a transcription of that proceeding, the trial court apparently held a hearing on November 10, 2004, and found Shore able to represent himself on state habeas and appellate review. S.H.R. at 663, 658. About two months later, however, Shore filed a motion requesting the appointment of counsel. The trial court appointed Kurt Wentz to represent Shore on appeal.

Supplemental S.H.R. at 1.  Over a year later, the trial court appointed Jules Laird to represent Shore on state habeas review.

Through appointed counsel, Shore sought relief in the Texas Court of Criminal Appeals.  Among other issues, Shore raised several arguments relating to his waiver of a punishment-phase defense.  Shore conceded that it "is clear from the nature of his request and the actions of counsel" that he "effectively waived the presentation of mitigating evidence."  S.H.R. at 125.  Still, Shore argued that the trial court had a constitutional obligation to determine whether he made the waiver competently, knowingly and intelligently, and voluntarily.  In addition, Shore argued that the trial court should have reviewed what trial counsel had done to prepare for the punishment phase before accepting any waiver.  And despite his instructions, Shore argued that trial counsel had an obligation to make more objections and engage in more cross-examination than they had done at trial.

The Court of Criminal Appeals affirmed Shore's conviction and sentence.  *Shore v. State*, No. AP-75,049, 2007 WL 4375939 (Tex. Crim. App. Dec. 12, 2007).  Because nothing in the record hinted that Shore was incompetent to make decisions about his defense, and the trial court had found him competent to enter a plea on the deferred adjudication charges, the Court of Criminal Appeals found that the trial court did not err by not performing a full inquiry into Shore's ability to waive mitigating evidence knowingly and voluntarily.  *Id*. at 13-14.  The Court of Criminal Appeals held that the trial court had no constitutional obligation "to inquire whether trial counsel had conducted an investigation regarding the existence of mitigation evidence" before accepting the waiver of mitigating evidence.  *Id*. at 11.

State habeas review followed many of the same themes as direct appeal.  The Court of Criminal Appeals held that the trial court had no constitutional obligation "to inquire whether trial counsel had conducted an investigation regarding the existence of mitigation evidence" before accepting the waiver of mitigating evidence.  *Id*. at 11.  Shore again conceded that he "apparently asked his attorneys to remain silent and not to present any mitigation evidence even though there was a large amount of mitigation evidence that would have at the very least raised some basis for argument to the jury on the [his] behalf."  S.H.R.

at 26.[3]  Shore, nonetheless, argued that the trial court had an obligation to admonish Shore of his rights and assure that the waiver was knowing and intelligent.  In addition, Shore identified alleged deficiencies in trial counsel's investigation into mitigating evidence, particularly for not seeking an MRI based on earlier brain injuries.

The trial-level habeas court entered specific findings of fact and conclusions of law, ultimately recommending that the Texas Court of Criminal Appeals deny habeas relief.  In a cursory order, the Texas Court of Criminal Appeals adopted the lower court's findings and conclusions and denied habeas relief.

### D.   Shore's Federal Habeas Petition and Federal Standards of Review

This Court appointed counsel to represent Shore throughout the course of federal habeas proceedings.  Shore raises three specific claims in his federal habeas corpus petition:

1.   Trial counsel provided ineffective representation under *Strickland v. Washington*, 466 U.S. 668, 686 (1984), by not conducting a reasonable investigation into mitigating evidence, not contesting the State's punishment case, and not presenting evidence of organic brain damage.

2.   The trial court failed to obtain a valid waiver of Shore's right to challenge the State's punishment case.

3.   Shore's brain damage reduces his culpability for his actions, preventing his execution under the Eighth and Fourteenth Amendments.

Respondent moves for summary judgment.  Insofar as they are consistent with established habeas practice and procedure, the Federal Rules of Civil Procedure apply to habeas cases.  *See* Rule 11 of the Rules Governing Section 2254 Cases.  "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to

---

[3]   In fact, state habeas counsel inserted his personal opinion that trial counsel should have ignored Shore's choice: "As an attorney, I don't envy the position of his trial attorneys when he made that call for no argument but as an advocate I cannot agree with not going against his wishes."  S.H.R. at 34.

the non-moving party.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor").  If the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") provides the predicate standards for reviewing habeas claims.

"[A] habeas petitioner has the burden under AEDPA to prove that he is entitled to relief."  *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000); *see also DiLosa v. Cain*, 279 F.3d 259, 262 (5th Cir. 2002).  A petitioner cannot meet this burden by merely alleging constitutional error.  Instead, "focus[ing] on what a state court knew and did," *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1399 (2011), an inmate must show that the state court's adjudication of the alleged constitutional error "was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'"  *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (quoting 28 U.S.C. § 2254(d)(1)); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

With those standards in mind, the Court turns to Shore's federal petition.

## II.   ANALYSIS

Shore's federal grounds for relief focus on trial counsel's representation relating to the punishment-phase defense, the trial court's obligation to assure that he properly waived the presentation of mitigating evidence, and the constitutional effect of his mental-health history.  Given the interrelated nature of Shore's claims, the Court will first address Shore's argument that he did not make a knowing and voluntary waiver of his right to present mitigation evidence.  Second, the Court will address whether Shore has shown that his trial attorneys provided deficient performance in the investigation and presentation of mitigating evidence.  Finally, the Court will discuss whether the Constitution precludes the State of Texas from executing Shore because of his mental condition or physical injuries.

### A.   Shore's Waiver of a Punishment Phase Defense

For the first time on federal review, Shore contends that he never instructed his

attorneys to waive a punishment-phase defense. Relying on a narrow reading of the specific language trial counsel used in open court, Shore alleges that he directed counsel only to forgo making any argument against a death sentence, but still wanted his attorneys to present punishment evidence. In a single paragraph of argument, Shore's second ground for relief argues that "[t]he record in Mr. Shore's case is devoid of statements constituting a valid waiver of his constitutional right to present and have the jury consider mitigation evidence. Mr. Shore was therefore deprived of his constitutional right to present and have the jury consider mitigation evidence, and he is therefore entitled to a new punishment hearing." Doc. # 39, p. 29. Yet even assuming that he wanted to waive the presentation of mitigating evidence, Shore argues that the Constitution requires the trial court to ascertain whether he did so knowingly and intelligently.

### 1.    Waiver

Shore contends that "the record does not prove that [he] instructed counsel not to present mitigation evidence." Doc. # 44, p. 6. Shore's argument is of recent vintage. In state court, Shore did not explicitly argue that he did not want to waive the presentation of mitigating evidence; he argued that the trial court should have assured that it was a valid waiver. In fact, Shore's briefing on state appellate and habeas review presumed that he had instructed his attorneys to forgo the presentation of evidence.[4]

The state-court decisions presumed that Shore intended to waive a mitigation defense.

---

[4]    On direct appeal, Shore raised three claims relating to the waiver of mitigating evidence. First, Shore argued that the trial court violated his constitutional rights by not inquiring into whether trial counsel had investigated potential mitigation evidence. Second, Shore asserted that the trial court's failure to inquire into the mitigation investigation resulted in a deprivation of his Sixth Amendment right to effective assistance of counsel. Third, and most germane to the matters before this Court, Shore also argued that "the trial court erred in failing to inquire whether his decision to waive the presentation of any mitigating evidence was competent, knowing, intelligent, and voluntary, and that this error renders his death sentence unconstitutional under the Eighth and Fourteenth Amendments." *Shore*, 2007 WL 4375939, at *8. Also, Shore specified on habeas review that he let trial counsel "(1) sit silent, (2) not object to any damaging evidence by the State effectively letting the State ride free rein over his life to a certain death sentence, and (3) not introduce any mitigation evidence for Special Issue No. 2." S.H.R. at 43.

14

On direct appeal, the Court of Criminal Appeals reviewed the record and, while not identifying an explicit waiver on the record, observed that "it is apparent from the record that [Shore] instructed his attorneys to approach the punishment phase of his trial in such a way that the death penalty would be imposed." *Shore*, 2007 WL 4375939, at *9. Indeed, the Court of Criminal Appeals held that the record "suggests that counsel indicated several times that the choice not to present mitigating evidence was [Shore's] and that, in so choosing, [Shore] was acting contrary to the advice of counsel." *Id.* at *11. The findings of fact on habeas review likewise repeatedly refer to Shore's waiver of presenting mitigating evidence. S.H.R. at 455, 458, 462, 466, 470, and 471.

Shore now says that he instructed his attorneys not to plead for life, but he "did not direct his attorneys to not present mitigating evidence or to not cross-examine the State's witnesses. Doc. # 39, p.3. The record before the Court is not complete regarding the circumstances, communication, and counseling between Shore and his trial attorneys. Aside from what was said on the record, trial counsel did not provide any explanation of the limitations Shore put on punishment-phase representation. The record contains no post-trial affidavit from the trial attorneys explaining what Shore told them and when he did so. The record, therefore, does not contain any indication of when Shore made a decision regarding his punishment-phase case, upon what information Shore made the choice, what conditions or limitations he placed on his attorneys, and what efforts trial counsel made to dissuade him from that path.

Generally, "courts indulge every reasonable presumption against waiver . . . ." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Shore, in post-judgment proceedings, had the opportunity to support his argument against waiver with evidence and material legal argument. He, however, did not in state court and now does not provide any factual or legal support for his argument that he did not wish to waive a mitigation case. This Court, therefore, is left with and must defer to the record created in, and the specific findings made by, the state courts. More specifically, the state courts both implicitly and explicitly found that Shore was competent and that he knowingly and intelligently waived the presentation of mitigation evidence. *See Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a

15

federal habeas court, we are bound by the state [trial] court's factual findings, both implicit and explicit.").[5]  Nothing in the record disputes or undermines Shore's competency to make decisions about his defense.  As the record is devoid of any evidence supporting Shore argument that he never intended to waive the presentation of mitigating evidence, this Court must defer to the state court finding that Shore "made a valid waiver with full understanding that available mitigation evidence could be presented in seeking a sentence of life rather than a death sentence, but that [he] instructed his attorneys not to present it."  *Shore*, 2007 WL 4375939, at *14; *see also* 28 U.S.C. § 2254(e)(1) (guaranteeing a presumption of correctness to state court factual findings).  These findings have not been shown to be unreasonable or contrary to Supreme Court authority.

## 2.    Trial Court Obligation with Respect to Waiver

Shore also argues that "the trial court's failure to ensure that [he] made a valid waiver deprived him of his constitutional right to contest the punishment phase of his trial."  Doc. # 39 at 28.  The Constitution guarantees a criminal defendant's right to put mitigating evidence before the jury.  *See Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).  The waiver of "constitutional rights in the criminal process generally . . . must be a 'knowing, intelligent ac[t] done with sufficient awareness of the relevant circumstances.'"  *Iowa v. Tovar*, 541 U.S. 77, 81 (2004) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)).

Shore, however, has not pointed to any Supreme Court precedent requiring a trial court to inquire into a defendant's decision not to present mitigating evidence.  In fact, Supreme Court precedent has "never imposed an 'informed and knowing' requirement upon

---

[5]    The state habeas court found that Shore "knowingly intelligently and voluntarily prevent[ed] . . . presentation of mitigation evidence . . . ."  S.H.R. at 460.  The state courts relied heavily on Shore's "expressed wish for the jury to answer the special issues in a way so that a death sentence would result."  S.H.R. at 468.  The state courts repeatedly referred to Shore's "decision not to allow counsel to present punishment evidence . . . ."  S.H.R. at 460; *see also* S.H.R. at 463 (referring to Shore's "choice not to present mitigating evidence"); S.H.R. at 466 (same).  The state habeas court concluded that "the evidence was sufficient to show that [Shore's] waiver to present mitigation evidence was knowing intelligent and voluntary in light of evidence of [his] high intelligence and his insistence that he wanted the death penalty imposed."  S.H.R. at 466.

a defendant's decision not to introduce evidence," suggesting that a trial court does not bear the duty to obtain an on-the-record waiver. *Schriro v. Landrigan*, 550 U.S. 465, 479 (2007). Shore has not shown that clearly established federal law requires a trial court to inquire into the waiver of mitigation evidence.

Even if the Constitution required a knowing and intelligent waiver, the record does not contain any information that would raise a concern about Shore's competence. Shore has not identified any mental illness or other condition that was manifest at trial. The trial court interacted with Shore on the record, presumably giving insight into his comprehension and competency. Immediately before the punishment phase the trial court found Shore competent to plead "true" to two other charges. Nothing in the record suggests that the understanding and comprehension Shore displayed in that colloquy was not representative of his mental state throughout trial. Simply, the record from the time of trial raises no concern about Shore's competency.

As Shore has not shown a basis to question his waiver of the right to present mitigating evidence, the Court denies Shore's second ground for federal habeas relief.

### B.    Ineffective Assistance of Counsel

Shore argues that trial counsel's representation fell below constitutional requirements in the investigation and presentation of mitigating evidence. Under *Strickland v. Washington*, 466 U.S. 668, 686 (1984), a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).[6]

---

[6]    Shore invokes the presumptive-prejudice test from *United States v. Cronic*, 466 U.S. 648, 659 n.26 (1984). Doc. # 39, p.21.  "*Cronic* held that a Sixth Amendment violation may be found without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial when circumstances exist that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Wright v. Van Patten*, 552 U.S. 120, 124 (2008) (quotation omitted).  *Cronic* applies "in only a very
(continued...)

On state habeas review, Shore raised various complaints about his trial counsel's failure to mount a punishment defense.  Shore's state habeas writ generally complained about trial counsel's choice to accede to his waiver and limit the mitigation case, but only focused on two areas of specific evidence that had been omitted.  First, Shore specifically criticized trial counsel for not seeking a medical and forensic determination of whether he suffered a brain injury or had other organic brain disorders.  S.H.R. at 41, 51-53.  Shore, however, did not bolster that argument with any medical examinations or reports providing concrete information about, let alone any material problems with, his brain structure.

Second, Shore faulted counsel for not using the information contained in the "mitigation investigation file" that trial counsel had developed with the aid of an investigator.  S.H.R. at 45-46.  Shore did not submit that file on habeas review.  Instead, he relied on an affidavit from his state habeas investigator opining that trial counsel should have presented testimony showing that Shore had suffered a head injury from a car accident; his complete psychological and psychiatric history available because of his probation or participation in the sex offender program; his school records, including from Houston Community College; his accomplishments as a professional musician; information about alleged sexual abuse by his mother; and additional background about his family living conditions and relationships.  S.H.R. at 165-66.

On federal review, Shore renews his attacks on trial counsel's preparation and presentation of punishment-phase evidence.  In doing so, Shore presents certain evidence for the first time.  He relies on results of an MRI performed during the pending federal habeas proceedings, which results show that prior to his trial he had suffered some brain damage.  Also, Shore includes several new exhibits, including the billing records of the investigator

---

[6]      (...continued)
narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all." *Gochicoa v. Johnson*, 238 F.3d 278, 284 (5th Cir. 2000); *see also Haynes v. Cain*, 298 F.3d 375, 381 (5th Cir. 2002).  This is not a case in which "counsel entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing."  *Cronic*, 466 U.S. at 659.

used by trial counsel, an affidavit from Shore's father, and a letter from Shore to his state habeas attorney.

Respondent's motion for summary judgment argues that by waiving a punishment defense at trial Shore also waived any claim relating to trial counsel's preparation of mitigating evidence. In the alternative, Respondent argues that federal law limits this Court's review to the evidence presented in state court. Finally, Respondent contends, whether under AEDPA's deferential standards or a *de novo* review, Shore has not shown a basis for habeas relief.

### 1.   Shore's Waiver of a Punishment Defense and *Strickland* Prejudice

From the outset, Shore's decision to waive a mitigation defense short-circuits his claim that trial counsel's representation fell below constitutional expectations. The state habeas court found that Shore "cannot knowingly, intelligently, and voluntarily prevent an act–that is, presentation of mitigation evidence–and then complain that certain mitigation evidence was not presented." S.H.R. at 460. Further, the state habeas court found that Shore "cannot claim ineffective assistance of trial counsel based on alleged lack of investigation concerning evidence that [Shore] prevented from being presented at trial." S.H.R. at 460.

Under Fifth Circuit case law, a competent defendant's "directions [are] entitled to be followed." *Lowenfield v. Phelps*, 817 F.2d 285, 292 (5th Cir. 1987); *see Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004), *Autry v. McKaskle*, 727 F.2d 358, 362 (5th Cir. 1984). As the "master of his own defense," *Moore v. Johnson*, 194 F.3d 586, 606 (5th Cir.1999), "'when a defendant blocks his attorney's efforts to defend him, . . . he cannot later claim ineffective assistance of counsel." *Sonnier v. Quarterman*, 476 F.3d 349, 362 (5th Cir. 2007) (quoting *Roberts*, 356 F.3d at 638). In *Schiro v. Landrigan*, 550 U.S. 465, 478 (2007), the Supreme Court concluded that "it was not objectively unreasonable for [the state post-conviction] court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence." *See also Villanueva v. Stephens*, 619 F. App'x 269, 274-75 (5th Cir. 2015).

"[I]t is apparent that [this Court is] being asked to permit a defendant to avoid conviction on the ground that his lawyer did exactly what he asked him to do. That argument answers itself." *United States v. Masat*, 896 F.2d 88, 92 (5th Cir. 1990). The denial of Shore's first claim for relief forecloses the availability of habeas relief on his *Strickland* claim.

### 2.     *Pinholster*

To the extent Shore can make a federal claim, he has raised new arguments and presented new evidence on federal habeas review. The Supreme Court has "emphasize[d] that review under § 2254(d)(1) focuses on what a state court knew and did." *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1399 (2011). Reasoning that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court," *Pinholster* explicitly held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at ___, 131 S. Ct. at 1399, 1400. Thus, the Supreme Court had made clear that, under most circumstances, "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id.* at ___, 131 S. Ct. at 1400.

Under *Pinholster*, Shore must be deemed to have defined the scope of his federal *Strickland* claim through his state habeas litigation. Much of the evidence on which Shore relies in his federal habeas action, however, ranges far from that adduced in state habeas court. This Court's review "is limited to the record in existence at [the time of the state court decision] *i.e.*, the record before the state court." *Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1398. Nevertheless, in the alternative, the Court will consider the full breadth of the information Shore presents in his federal petition.[7]

---

[7]     In a related argument, Respondent contends that any extension of Shore's claims beyond that he presented in state court is unexhausted and procedurally barred. Shore counters that, under *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309 (2012), his state habeas counsel's failure to advance the whole breadth of his federal claims should forgive any

(continued...)

### 3.    Alternative Review of the Merits

Shore argues that trial counsel should have investigated and presented a more fulsome punishment defense.  The Supreme Court has repeatedly emphasized a trial attorney's duty to investigate viable defensive theories.  *See Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins*, 539 U.S. at 522-23; *Williams v. Taylor*, 529 U.S. 362, (2000); *Strickland*, 466 U.S. at 688.  "An attorney has a duty to independently investigate the charges against his client." *Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007).  But merely showing a lapse in investigation is insufficient for federal habeas relief.  A habeas petitioner "must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial." *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *see also Greer v. Thaler*, 380 F. App'x 373, 386 (5th Cir. 2010); *Carty v. Quarterman*, 345 F. App'x 897, 903 (5th Cir. 2009); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1101 (5th Cir. 2006); *Duff-Smith. v. Collins*, 973 F.2d 1175, 1183 (5th Cir. 1992); *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).  Shore "must name the [uncalled witnesses] witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)); *see also Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008); *O'Brien v. Dretke*, 156 F. App'x 724, 733 (5th Cir. 2005).  Constitutional error cannot rest on the naked assertion that trial counsel should have done more, for "speculations as to what [uncalled] witnesses would have testified is too uncertain." *Alexander*, 775 F.2d at 602; *see also Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) ("[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative.").

---

[7]    (...continued)
procedural impediments.  Given this Court's discussion of the lack of prejudice that results from a *de novo* review of his entire claims, the Court finds that Shore cannot overcome the procedural bar to merit federal relief.  *See id.* at 1320 (requiring a showing of legally cognizable prejudice).

Shore's federal habeas claim faults trial counsel's punishment-phase preparation, presentation of evidence, and cross-examination of evidence in five areas: (1) not presenting evidence of brain injury; (2) not calling Shore's father as a witness to refute his sister's testimony; (3) not exposing flaws in the State's case, specifically those relating to his sister's account; (4) not objecting to the prosecution's use of two photographs of one victim; and (5) allowing "the utter abdication that occurred in the punishment phase of trial" that resulted in "aura of inevitability about Mr. Shore's fate."  Doc. # 38, pp. 27-28.

As previously noted, federal habeas relief is only available to Shore for failure to investigate if he can show that trial counsel should have engaged in an investigation that would have turned up new matters, a reasonable attorney would have presented them at trial, and their presentation would have created a reasonable probability of a different trial result. Because Shore waived the presentation of mitigating evidence at trial, however, the record only weakly hints at what trial counsel investigated and what defensive theories they prepared before Shore waived a punishment defense.  The sparse record on whether trial counsel provided deficient performance under *Strickland* encourages the Court to focus on whether Shore has shown *Strickland* prejudice.  In doing so, AEDPA deference to state court findings and conclusions is due regarding the issues exhausted and adjudicated on the merits in state court.

### a.    The Affidavit From Shore's Father

The State called Shore's sister, Regina Shore Belt, to testify in the punishment phase. Ms. Belt provided insight into Shore's background.  Ms. Belt testified that their parents had divorced when Shore was a teenager.  She described Shore as intelligent, a gifted musician, and a talented artist.  However, Ms. Belt also provided the jury with a broad view of Shore's life, including his turbulent relationships, her concerns that he was abusing his daughters, his drug use, and other troubling actions.

The State adduced testimony from Ms. Belt about three incidents which demonstrated that Shore's disturbing acts emerged in childhood.  First, Ms. Belt testified that, when Shore was four or five years old, he killed a kitten from next door with a knife.  Tr. Vol. 21 at 38.

Second, Ms. Belt testified that Shore once "for no particular reason . . . pushed a screwdriver through the top of [her] head." Tr. Vol. 21 at 39. Third, Ms. Belt explained about Shore's disturbing acts when he was in junior high: "We would go for bicycle rides where he would have me go up and knock on people's doors and have peoples daughter's come out, girls that he went to school with; and he would essentially grope them tried to kiss on them and stuff." Tr. Vol. 21 at 40. She testified that Shore preferred "skinny girls that are of small build always." Tr. Vol. 21 at 40. Later, Shore and his sister "cruised like to high schools and he would offer girls rides home and he usually would drop [her] off, like, at a shopping center." Tr. Vol. 21 at 42. Ms. Belt did not know what Shore would do with the girls once she exited the car.[8]

Trial counsel only asked Ms. Belt a few questions about their father's bad temper and abusive behavior. The State only passingly mentioned Ms. Belt during closing arguments, and did not revisit her testimony. Tr. Vol. 24 at 139.

In an affidavit dated January 12, 2014, Shore's father, Robert Eugene Shore, explains that the trial attorneys visited him before trial, but only asked him questions about Shore's convictions for indecency with a child. Doc. # 39, Exhibit 2. Shore's father explained in his affidavit that he could provide testimony that he was "not aware" of some incidents from Shore's childhood that Ms. Belt discussed at trial.[9] Shore argues that his father could have

---

[8]    While Shore challenges trial counsel's representation for "not exposing flaws in the State's case, specifically those relating to his sister's account," his father's affidavit is the only basis he provides to contradict Ms. Belt's testimony.

[9]    Specifically, Shore's father testified:

8.    I am not aware of any incident in which Anthony killed or injured a cat or any other animal. I would have been willing to testify to this fact at Anthony's capital murder trial.

9.    I am not aware of any incident in which Anthony used a screw driver or any other similar item to stab or otherwise harm his sister, Regina Ray Shore-Belt. I would have been willing to testify to this fact at Anthony's capital murder trial.

(continued...)

"contested much of [Ms. Belt's] damaging testimony[.]"  Doc. # 39, p. 27.  Both by calling his father as a witness and through cross-examination of his sister, Shore wishes that trial counsel had disputed Ms. Belt's testimony that he killed a kitten at a young age and used his sister as bait to lure young women into vulnerable circumstances.

Shore has not shown that actual prejudice resulted from trial counsel not presenting the jury with the information in his father's affidavit.  The affidavit does not directly undermine the effect of or contradict Ms. Belt's testimony.  And, at most, the affidavit demonstrates only that Shore's father does not remember, or did not know about, those events.  Further, Ms. Belt's testimony about Shore's violent and illegal proclivities as a youth were only small facets in the State's highly incriminating presentation of evidence.  In this case, evidence of Shore as a child killing a kitten pales in comparison to murders Shore committed.  Evidence that Shore enlisted his sister as a child to enable him to work a ploy to grope young girls pales in comparison to the numerous violent sexual assaults he committed throughout his life, including the long-term sexual abuse of his own daughters.  No reasonable probability of a different result flows from trial counsel's failure to present the testimony in Mr. Shore's affidavit.

### b.    Brain Damage

Shore apparently informed trial counsel's investigator that he suffered a head injury in an automobile accident in 1981, apparently when he was a teenager.  At trial, neither the prosecution nor the defense made mention of possible brain damage.  At trial, Sharon Ann Burns, a licensed professional counselor who was clinical director of the sex offender

---

[9]      (...continued)

10.    I am not aware of any incident in Anthony's childhood in which Anthony and his sister, Regina Shore-Belt, rode their bicycles to the homes of Anthony's female classmates so that Regina could bring the young women outside in order for Anthony to grope or attempt to kiss them.  I would have been willing to testify to this fact at Anthony's capital murder trial.

Doc. # 39, Exhibit 2.

program that Shore attended from 1998 to 2003, testified that she could find no evidence of organic brain damage in Shore's records.  Tr. Vol. 24 at 46.  Shore faults his trial attorneys for not having an MRI done to determine the scope and effect of any resultant injuries.

On state habeas review, Shore criticized trial counsel for not investigating whether he suffered from any brain damage.  Shore specifically argued that trial counsel should have "obtain[ed] the assistance of a forensic psychiatrist to examine the MRI results for any disability or inability to comprehend the difference between right and wrong and to present this evidence in mitigation of punishment . . ." S.H.R. at 41.  Shore supported this claim with an affidavit from Ms. Burns in which she again affirmed that "to the best of [her] knowledge [she] was not aware of any brain trauma that Mr. Shore may have suffered."  *Id*. at 163.  After reviewing her file, however, Ms. Burns gave her "professional opinion if Mr. Shore had received any brain trauma or suffered from an organic brain disorder this could have contributed to his commission of the extremely violent acts for which he has been convicted."  *Id*. at 163.  She also opined that he may "suffer[] from an attachment disorder." *Id*. at 163.  While Ms. Burns did not believe that any of those disorders would "exonerate[] him of his guilt," she speculated that "it is possible that neurological assessments could shed light on whether or not his brain functions are substantially different from that of persons who do not commit sexually sadistic serial killings.  It is my understanding that Mr. Shore had somehow linked extreme violence with his ability to achieve sexual gratification."  *Id*. at 163.

The state habeas court found no deficient performance or prejudice with regard to the information in Ms. Burns' affidavit.  In particular, the state habeas court found that "Sharon Burns' habeas affidavit, even with its speculative statements, does not contradict her trial testimony concerning lack of evidence of organic brain damage in the applicant."  *Id*. at 462. Even taking her speculation as true, the state habeas court discounted any suggestion that brain injury would have been an influential factor in the penalty phase.  Specifically, the state habeas court discounted any possibility that a brain defect identified by an MRI would show "any disability or inability to comprehend the difference between right or wrong" because

of Shore's "own statements showing his awareness of the difference between right and wrong, he was remorseful, he was prepared to give up his life for his crimes, [and] he believed it was time to sacrifice his life for what he did." *Id*. at 462.

On federal review, Shore renews his claim that trial counsel should have had an MRI examination. This Court authorized funds for an MRI. Two experts evaluated Shore's mental health history on federal habeas review: Dr. Kent A. Kiehl, Ph.D., an expert in clinical neuroscience, and Dr. William Orrison, M.D., a licensed and board certified neuroradiologist. Dr. Kiehl reported that Shore had experienced two head injuries that raised neurological concern.[10] Because the second accident "suggest[ed] a blow to the frontal cortex," Dr. Kiehl recommended that Shore undergo an MRI. Doc. # 39, Exhibit 6 at 5.

Dr. Orrison performed an MRI on January 15, 2015. From the MRI, Dr. Orrison made three observations:

    1.    "Patients with injuries or damage to the hippocampus have problems with memory and significant emotional problems including anxiety, irritability and short-temperedness. The hippocampus is also integral to the Papez Circuit (amygdalohippocampal-septo-hypothalamic-mesencephalic continuum) also referred to as the "Emotional/Visceral Brain." Abnormalities involving these brain regions may result in a variety of emotional disturbances including emotional lability,

---

[10]    First, Shore had a bike crash as a child. "He reported brief loss of consciousness as well as dizziness and memory problems post event. This appeared to be a mild traumatic brain injury." Doc. # 39, Exhibit 6 at 4. Second, Shore experienced a "major neuronal insult with significant injury" when "on April 16, 1981, he was in a serious head-on vehicular collision . . . ." Doc. # 39, Exhibit 6 at 4. According to a lengthy document labeled "Shore Adult History" which apparently chronicles the results of an investigator's inquiry into Shore's background,

    [o]n April 16, 1981 after a night of drinking [Shore] and [his friend] Brad were in a bad car accident and the two were hospitalized for multiple traumatic injuries. [Shore's] jaw had to be wired shut, his knee was torn apart, his left hand was crushed and there were contusions to his ribs and ankles.

Doc. # 39, Exhibit 5.

aggression, and violent outbursts."

2.   "Patients with injuries or damage to the frontal lobe of the brain would be anticipated to exhibit a variety of potential functional alterations or deficits including decreased cognition, personality changes, loss of insight and foresight, and difficulty with the initiation of activities . . . ."

3.   Structural problems "consistent with a process such as Fetal Alcohol Spectrum Disorders (FASD) and/or prior head trauma" effected an area of Shore's brain "important in maintaining normal cognitive function." Dr. Orrison also observed that "[c]onsequences of in utero alcohol exposure include serious effects on the brain with accompanying significant changes in behavior and cognition that can even occur in individuals without full FAS features.  These include problems such as poor coordination or balance, learning disorders and delayed development, poor memory, difficulty with attention and processing information, difficulty with reasoning and problem-solving, problems identifying consequences of their choices, poor judgment skills, hyperactivity and rapidly changing moods. Individuals with FASD may also exhibit behavior abnormalities such as trouble getting along with others, poor social skills, difficulty adapting to change, poor impulse control, poor concept of time, difficulty staying on task and problems with planning or working toward goals . . . ."

Doc. # 39, Exhibit 6 at 27.[11]  From those injuries, Dr. Orrison opined that "abnormalities in Mr. Shore's brain could be anticipated to result in a variety of potential behavioral and emotional problems."  Doc. # 39, Exhibit 6 at 28.

---

[11]   Dr. Orrison specifically observed  "moderate hippocampal atrophy . . . , abnormal bilateral frontal white matter changes consistent with shearing (diffuse axonal) injury and a relative decrease in anterior corpus callosum fiber tracts with decreased FA values.  These findings are consistent with prior head injury."  Doc. # 39, Exhibit 6 at 17.  In addition to the structural injuries attributed to head trauma, Dr. Orrison observed "focal volume loss" which is "consistent with a process such as Fetal Alcohol Spectrum Disorders (FASD) and/or prior head trauma."  Doc. # 39, Exhibit 6 at 26.  FASD "is a permanent birth defect resulting from maternal alcohol use during pregnancy" which "is often accompanied by growth deficiency, minor facial anomalies, and brain abnormalities in both structure and function."  Doc. # 39, Exhibit 6 at 26.

Dr. Kiehl reviewed Dr. Orrison's report and also opined that "Shore had reduced volumes and tissue loss in a number of areas including the frontal lobes, olfactory lobe, hippocampus, and insula." Doc. # 39, Exhibit 6 at 5. Dr. Kiehl stated that "[g]rey matter volume loss" such as that "is often seen as a consequence of traumatic brain injury." Doc. # 39, Exhibit 6 at 5. From that review, Dr. Kiehl believed that Shore had suffered a traumatic brain injury that had damaged tissue in an area of the brain that "can lead to serious symptoms of personality maladjustment, impulsivity, and poor decision-making." Doc. # 39, Exhibit 6 at 5.

The results of Shore's MRI constitute the strongest mitigating evidence that was not presented at trial. Federal review has converted earlier speculation that Shore suffered a brain injury into a fact. Nevertheless, the evidence Shore has developed does not have decisive value as mitigating evidence to show *Strickland* prejudice for several reasons. First, as Respondent argues, "Shore's mental problems, sexual deviancy, and drug use began well before the alleged car accident, which compromises the significance of this evidence." Doc. # 42, p. 75. While Respondent's argument does not take into full consideration the possibility of earlier brain trauma or Fetal Alcohol Syndrome, jurors may have difficulty attributing the lifelong sexual deviance, combined with violence, to the brain injuries.

Second, Respondent argues that the testimony at trial about Shore's non-criminal behavior and other characteristics conflicts with the experts' description of a person with brain damage. Other than possibly with regard to his crimes, the record did not show that Shore lived in a manner that indicated cognitive impairment. In fact, the state habeas court recognized that Shore had "superior intellect and abstract reasoning ability," and although he "was grandiose, opportunistic, manipulative, and narcissistic," he was still "aware of what was socially acceptable, but he would break a law if he thought he could get away with it." S.H.R. at 452.

Third, even to the extent that Shore shows brain trauma, the experts' assessment of what that did to his thinking and his actions is tentative and inconclusive. The experts opine that the injuries "*could be anticipated* to result in a variety of potential behavioral and

emotional problems" but do not concretely identify what effect they have had in Shore's life. The experts list numerous cognitive, behavioral, and social difficulties that *may* arise from brain trauma, but do not tie any of those issues to Shore himself.  The sterile academic effect of brain-injury evidence is generalized, and its effect in light of the rest of the trial record is muted in the absence of a link to Shore's conduct.

Most importantly, even taking the evidence at its most beneficial, Shore has not shown that presenting it would create a reasonable probability of a different result.  Shore concedes that testimony about a brain injury may act as a "two-edged sword" by increasing the likelihood the defendant will be found a future danger by the jury.  Doc. # 39 at 35-36.  The Fifth Circuit has ruled that "evidence of organic brain injury presents a 'double-edged' sword . . . ."  *Martinez v. Dretke*, 404 F.3d 878, 889 (5th Cir. 2005).  "Presenting evidence of "organic (i.e., permanent) brain damage, which is associated with poor impulse control and a violent propensity, would have substantiated the state's evidence and increased the likelihood of a future dangerousness finding."  *Id.* at 890.  In a similar  manner, "evidence of fetal alcohol syndrome-related deficiencies is not necessarily beneficial to a criminal defendant."  *Sells v. Stephens*, 536 F. App'x 483, 495 (5th Cir. 2013); *see also Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012).  Moreover, the Fifth Circuit has stated that a juror could see some mental conditions only as aggravating because they increase the likelihood that a defendant will act violently again.  *See Nelson v. Quarterman*, 472 F.3d 287, 307-08 (5th Cir. 2006).  And, as the Seventh Circuit has noted, sentencers "may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate to incapacitate."  *Foster v. Schomig*, 223 F.3d 626, 637 (7th Cir. 2000) (quotation omitted).  Finally, without meaningful factual support that treatment or confinement would control the effects of his mental illness, the jury would be left to conclude that his violent acts would persist immutably.  Shore has not shown that prior attorneys prejudiced the defense by failing to have an MRI done of Shore's brain.

### c.     Photographic Evidence

Shore only makes a cursory reference to trial counsel not objecting to photographic evidence: "And trial counsel could and should have objected to much of the State's punishment evidence, including two unfairly prejudicial photographs of Ms. Lesher."  Doc. # 39 at 36.  Shore's summary briefing on this point provides an inadequate basis to determine that trial counsel missed a viable objection and whether the photographs prejudiced Shore's trial.  Shore also argues that trial counsel did not adequately cross-examine witnesses, but only specifically points to testimony from Ms. Belt.  The Court, therefore, summarily denies that argument for the reasons it denies the claim that trial counsel should have called Shore's father as a witness.

### d.     Cumulative Prejudice

The Court next considers whether, had trial counsel presented a defense in the manner Shore proposes on federal review, there would have been a reasonable probability of a different result.  In doing so, the Court considers the full panoply of evidence on which Shore bases his federal *Strickland* claim.  Shore's evidence can only provide for habeas relief in light of the full case put before the jurors who decided his fate.

Despite the absence of defense evidence in the punishment phase, the State's witnesses, both on direct examination and through trial counsel's cross-examination, provided jurors with some insight into Shore's life.  The state habeas court found that,

> notwithstanding [Shore's] choice not to present punishment evidence, [Shore's] jury was aware . . . that [Shore] was extremely intelligent; that he was a gifted musician and artist; that his parents divorced when he was fourteen or fifteen; that his father had a bad temper and hit [Shore] and his siblings with whatever was convenient; that his father beat his mother; that [Shore] attended college; that [Shore] was employed as a telephone installer and a tow truck driver; that [Shore] played in a band, that [Shore] was sweet; that [Shore] drank and took drugs; that [Shore]  found God in jail; that [Shore] did not have a bad temper; that [Shore] confessed his crimes to the police; that he fought his evilness and did not kill Joanna Lesher; that [Shore] cried when telling Sergeant Swaim how he killed the complainant; and that [Shore] told Lynda White that he was remorseful.

S.H.R. at 459.  The jury also knew details about how Shore's parents raised him, including that his mother "attempted to get advice about [Shore] from a priest."  S.H.R. at 459.  In short, the jury had an opportunity to consider Shore's "home life, good characteristics, talent, intelligence, employment, family oddities, education, religion, remorse, alcohol and drug use, and psychopathy . . . ."  S.H.R. at 461.

Shore argues that trial counsel should have augmented that evidence and created sympathy for Shore with evidence that would lessen the aggravating information against him. A reviewing court must place Shore's *Strickland* claim and mitigating evidence into context. The jury would have to plug Shore's mitigating evidence into a fully textured and detailed view of his lifelong sexual deviance and violence.  The jury convicted Shore for brutally murdering Ms. Estrada when she resisted his sexual advances.  This murder alone and Shore's conduct leading up to it provided the jury with a strong basis to answer the special-issue questions in a way that resulted in a death sentence.  And, this murder was not an isolated incident in Shore's life.  The briefest summary of his crimes conclusively forecloses a showing of prejudice under *Strickland*.  The jury heard extensive testimony about Shore's other crimes.  He was obsessed with power and control over females.  He sexually assaulted his own daughters for years.  He had committed aggravated assault on a minor whom he had stalked, but who only lived because Shore wanted to prove to himself that he could rape without killing.  Shore repeatedly drugged women before raping and starting to strangle them, acting out crimes he would other times see through to fruition.  Shore raped and killed at least three other females, two of whom were minors.

The weight, pervasiveness, and intensity of the evidence in aggravation far outstrips the mitigating effect of Shore's arguments on federal review.  Regardless of whether *de novo* review or AEDPA deference frames federal consideration, the evidence and argument on which Shore bases his *Strickland* claim falls far short of providing actual prejudice.  The Court denied Shore's *Strickland* claim.

### C.  **Constitutionality of Executing Mentally Ill Offenders**

In his final claim, Shore contends that the brain injuries he suffered make him morally blameless for the crimes he committed.  Shore argues that "the death penalty case serve no legitimate purpose when applied to defendants who, due to brain damage at the time of the offense, exhibit a severe lack of decision-making abilities and exhibit extreme impulsivity." Doc. # 39, p. 34. Shore sees the Supreme Court's exemption from execution of the intellectually disabled in *Atkins v. Virginia*, 536 U.S. 304 (2002), and of juveniles in *Roper v. Simmons*, 543 U.S. 551 (2005), as milestones along a path that leads to the same exemption for brain-damaged offenders.

Shore did not exhaust this claim in state court.  As the Texas courts would find any belated attempt to raise this claim an abuse of the writ, procedural law bars federal consideration of its merits.  Because Shore makes no effort to overcome the resultant procedural bar, federal consideration of final claim is not available.

In any event, a federal court can reject a procedurally deficient claim on the merits. 28 U.S.C. § 2254(b)(2); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (denying a procedurally barred claim under *Teague*).  Federal habeas review exists to enforce, not create, constitutional law. *Teague v. Lane*, 489 U.S. 288 (1989), bars federal habeas courts from creating "a new rule" of constitutional law; that is, federal courts cannot "break[] new ground," "impose[] a new obligation on the States or the Federal Government," or issue a decision that was "not dictated by precedent existing at the time the defendant's conviction became final." *Id.* at 301.  Federal law currently has not extended a constitutional exemption from execution to individuals with mental problems whose illness does not reach that of incompetency or insanity.  *See Johnson v. Stephens*, 617 F. App'x 293, 303-04 (5th Cir. 2015); *Ripkowski v. Thaler*, 438 F. App'x 296, 303 (5th Cir. 2011); *ShisInday v. Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006); *In re Woods*, 155 F. App'x 132, 136 (5th Cir. 2005).  Because Shore's final claim requires the creation of new constitutional law, *Teague* bars habeas relief.

Accordingly, the Court finds that Shore has not shown that procedural or substantive

law provides a basis for federal habeas corpus relief.  This Court denies Shore's third claim.

## III.   CERTIFICATE OF APPEALABILITY

AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal.  *See* 28 U.S.C. § 2253(c); FED. R. APP. P. 22(b).  Shore has not sought a Certificate of Appealability ("COA"), though this Court may consider the issue *sua sponte*.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  The Court must address whether the circumstances justify an appeal before issuing a final judgment.  *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Under the controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336.  Where denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

After careful review of the pleadings and the applicable law, the Court concludes that reasonable jurists would not find that this Court was incorrect in its procedural ruling or that the Court's assessment of the constitutional claims was debatable or wrong.  Because Shore does not otherwise allege facts showing that his claims could be resolved in a different manner, this Court will not certify for appeal any of his habeas claims for consideration by the Court of Appeals for the Fifth Circuit.

IV.     **CONCLUSION**

For the reasons discussed above, Shore has not shown an entitlement to federal habeas relief.  It is therefore

**ORDERED** that Anthony Shore's Petition for a Writ of Habeas Corpus is **DENIED WITH PREJUDICE**.  It is further

**ORDERED** that no certificate of appealability will issue in this case.

SIGNED this 19th day of February , 2016.


NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE